MICHAEL McDERMOTT, Plaintiff, v. METROPOLITAN SANITARY DIS-
TRICT *et al.*, Defendants.—MICHAEL McDERMOTT, Plaintiff-Appellee, v.
THE VILLAGE OF PALATINE, Defendant-Appellant and Third-Party
Counterplaintiff-Appellant (Metropolitan Sanitary District, Third-Party and
Counterdefendant-Appellee; Salt Creek Rural Park District, Third-Party
Counterdefendant).

First District (4th Division) Nos. 1—89—2913, 1—90—0275 cons.

Opinion filed December 4, 1992.—Rehearing denied January 29, 1993.

6

David Lincoln Ader and Thomas G. DiCianni, both of Ancel, Glink, Diamond & Cope, P.C., and Barry G. Bollinger, Edward F. Ruberry, and Stuart A. Ringle, all of Bollinger & Ruberry, both of Chicago, for appellant.

John T. Demos and Linda A. Leonetti, both of Demos & Burke, of Chicago (Joseph E. Tighe, of counsel), for appellee Michael McDermott.

Williams & Montgomery, Ltd., of Chicago (Barry L. Kroll, James J. Horstman, Jeffrey H. Lipe, and C. Barry Montgomery, of counsel), for appellee Metropolitan Sanitary District.

JUSTICE McMORROW delivered the opinion of the court:

Plaintiff Michael McDermott (McDermott) was rendered a permanent quadriplegic from injuries he sustained when he fell into a storm water drainage ditch while riding his bicycle along a dirt path in a lot in the Village of Palatine (the Village). McDermott filed suit against the Village, the Metropolitan Sanitary District (the MSD), and the Salt Creek Rural Park District (the Park District), alleging *inter alia* that each defendant had been willful and wanton for failure to properly maintain the ditch or warn of the hazards associated with the ditch. The matter was submitted for trial, and the jury assessed McDermott's damages at $16 million. It found the Village 67% liable for McDermott's injuries, and the MSD 33% liable. The jury returned a verdict in favor of the Park District and against McDermott, and the Park District is not involved in this appeal.

Following trial, the trial court found that a settlement agreement between McDermott and the MSD, which had been entered into during the jury's deliberations, was in good faith. On this basis, the trial court entered judgment in favor of the MSD with respect to McDermott's claims against the MSD. The trial court also denied the Village's post-trial motion for a new trial.

The Village appeals and raises numerous issues challenging the judgment entered by the trial court. The Village argues that it did not hold a property interest in the ditch into which McDermott fell, and that, assuming the Village did hold a property interest in the ditch, this interest was legally inadequate to impose a tort duty upon the Village to repair or maintain the ditch. The Village also asserts that the verdict was against the manifest weight of the evidence, and that the court improperly excluded evidence that McDermott's bicycle did not have brakes on the date of the incident. The Village further contends that various rulings by the trial court deprived the Village of

procedural due process. Lastly, the Village argues that the trial court erred in its finding that a settlement agreement between McDermott and the MSD was in good faith.

We find the arguments of the Village insufficient basis to reverse the determinations of the trial court. Accordingly, we affirm.

The entire record in the instant cause spans in excess of 10,000 pages. Although we have exhaustively reviewed and studied the record, we restate matters of record only to the extent necessary for an understanding of the evidence presented at trial. Additional matters of record are recited as pertinent to the issues presented in this appeal.

### EVIDENCE AT TRIAL REGARDING McDERMOTT'S ACCIDENT

McDermott testified that in June 1984, he was 17 years old, a junior in high school, and lived with his mother in Mount Prospect, Illinois. McDermott stated that on June 7, 1984, he rode his dirt bike to the home of Kurt Stier (Stier), in Mount Prospect, arriving at approximately 11:30 a.m. McDermott testified that he and Stier rode their dirt bikes to the house of Stier's grandparents in Palatine. McDermott related that they stayed at the grandparents' home all day and left between approximately 8 and 8:30 p.m. McDermott testified that it was still daylight when they left the residence of Stier's grandparents.

McDermott stated at trial that on their ride home, he and Stier got lost. McDermott testified that they rode down a dirt road (Kenilworth Road) in Palatine that bordered a vacant lot, and saw a path through the lot to a park with a baseball field. McDermott stated that he and Stier intended to take this path to another road, which they could see farther in the distance. McDermott recounted that he went down the path ahead of Stier. McDermott testified that the path was bumpy, and they were riding at a normal rate of speed. McDermott recalled that as he was riding along the dirt path, he was looking ahead to the baseball field in front of him at the end of the weeded section through which the path led them. McDermott could recall nothing further of the incident. He testified that he never saw the ditch that intersected the dirt path along which he was riding. He testified that he had never previously been to the vacant lot on which he was riding when he was injured.

Kurt Stier, who was 18 years old at the time of trial, testified that on the date of McDermott's accident, he was 13 years old and attended junior high school. His testimony regarding events preceding McDermott's accident was substantially similar to the account given

by McDermott. Stier further testified that as they were riding along the dirt path, which was about 75 yards long, they were going at "regular bicycle speed." He stated that McDermott, who was riding in front of him, suddenly disappeared from Stier's view. Stier testified that he got off his bike and approached on foot. He stated that he found McDermott in the bottom of a ditch that intersected the path they had been riding.

Stier recounted that he was about a foot away from the ditch when he saw it. Stier testified that the ditch, which was 10 feet from the park farther along the path, was three to four feet wide and five to six feet deep where it intersected with the path. Stier stated at trial that the banks of the ditch were steep, and that weeds that had grown along the path and the ditch were approximately two feet high.

Stier testified that when he first saw McDermott in the ditch, he thought McDermott was "joking" and was not actually hurt. Stier told McDermott to get up, but McDermott did not respond. Stier stated that he jumped into the ditch and asked McDermott if he was all right. Stier related that McDermott gave no reply. Stier stated that he waited approximately 10 minutes for McDermott to get up and then went to seek help. Stier testified that initially he tried to find the home of a former football coach, who he knew lived in a nearby subdivision and whom he had visited once before. Stier testified that he rode his dirt bike around the area but could not find the house. Stier stated that he then returned to where McDermott had fallen into the ditch. Stier recounted that McDermott had not moved since Stier's earlier departure.

Stier stated that he became frightened. He testified that it was starting to get dark out, and he noticed a light in one of the nearby condominiums. Stier stated that he ran to this home and knocked on the door, telling the residents his friend was hurt. Stier estimated that it was approximately 15 to 25 minutes from their departure from his grandparents' house to the time of McDermott's accident. He stated that approximately 20 minutes elapsed between McDermott's fall and Stier's request for help from the nearby condominium.

Gail Anderson, who lived in one of the condos near the vacant lot, testified that on June 7, 1984, Stier knocked on her door. Anderson testified that Stier was in a very agitated state and told her that his friend had been injured. Anderson stated that she called the paramedics and that it was approximately 8:45 p.m. at the time of her call. Anderson testified that she then went to the scene and saw McDermott lying in the ditch. She stated that it was dusk at that time, and that there was sufficient light for her to see McDermott. Anderson

also testified that she had often seen people use the area for recreation, including fishing, as well as bike and motorcycle riding.

Craig Dieckman, a paramedic fire fighter for the Village from January 1981 to August 1988, testified that they received a call on June 7, 1984, at 9:29 p.m. regarding McDermott's accident. Dieckman testified regarding paramedic measures that were undertaken at the scene.

William King, a Village patrolman who went to the scene of McDermott's accident on June 7, 1984, pursuant to a radio call he received at approximately 9:34 p.m., testified that he spoke to Stier at the scene. King stated that Stier was very emotional but appeared to be able to give accurate information, and that Stier told King who McDermott was, where McDermott lived, and where McDermott's mother was working at the time. King testified that his police report indicated that Stier told King that McDermott was riding through the field at a "high rate of speed" when McDermott hit a bump in the path, lost control of his bike, and "crashed into the hole."

King also stated that his police report indicated that Stier had told King that it was dark at the time of McDermott's accident, and that Stier had told King that the accident occurred approximately five minutes before the paramedics arrived. King testified that he had no recollection of Stier's statements independent from what King had written in his police report. King also testified that the day following McDermott's injuries, King returned to the scene with Officer Jano of the Village police department. At that time, King noticed a bump two to three feet from the ditch.

Michael E. Jano testified that he has been police sergeant for the Village from January 1987 to the date of trial. Jano stated that in June 1984, when he was a patrolman for the Village, he went to the scene the day after McDermott's accident. Jano testified that he had been instructed to take photographs of the scene and that this was a common procedure for accidents causing significant bodily injury. Jano stated that he went with Officer King, who had responded to the call the previous evening. Jano estimated that the weeds around the ditch were approximately 18 to 24 inches high. He testified that he had never seen the ditch before.

Henry J. Yario testified that he was a retired meteorologist with the National Weather Service. Yario stated that according to National Weather Service records, sunset in Chicago occurred at 8:23 p.m. CDT on June 7, 1984. Yario stated that National Weather Service records indicated that civil twilight, which corresponds to the point in time when there is a minimum of sky illumination required to perform

normal outside work, occurred approximately 34 minutes after sunset, at 8:57 p.m. CDT. Yario further testified that according to official records of the National Weather Service, it was overcast and partly cloudy at O'Hare International Airport at approximately 8:27 p.m. CDT on June 7, 1984.

Gary M. Yarkony, a physician certified in physical medicine and rehabilitation and a specialist in spinal cord injuries, testified that McDermott sustained fractures to the spinal cord vertebrae in the neck area just below the base of his brain. Dr. Yarkony testified that, to a reasonable degree of medical certainty, McDermott's injury was consistent with someone falling off a bike into a ditch. The physician also testified that McDermott has been rendered a permanent quadriplegic from the accident. Dr. Yarkony detailed the extent of required on-going medical care for McDermott's condition, including the costs of this care. Similar testimony regarding daily care of McDermott was provided by McDermott's mother and his nurse. The parties stipulated at trial that McDermott's total medical bills to the date of trial amounted to $1,127,447.65.

### GENERAL CONFIGURATION OF PROPERTY ON WHICH ACCIDENT OCCURRED

It was undisputed at trial that the lot on which McDermott was injured is a 30-acre tract of land commonly referred to as Lot 5. Lot 5 was bounded on the north by a dirt road commonly called Kenilworth Road and on the west by a condominium development named the Willow Creek Condominiums. To the east of Lot 5 was the Salt Creek, and thereafter another vacant lot which was called the East Lake parcel. Route 53 was located to the southeast of Lot 5, and Northwest Highway ran to the southwest of Lot 5. Lot 5 contained a lake, commonly called Lake Irene, into which drained a portion of the Salt Creek. Appendix A to this opinion, which is a rough diagram adapted from the evidence and included in McDermott's appellate brief, illustrates the pertinent characteristics of Lot 5 and surrounding property.

We note that testimony at trial indicated that there was a pumping station on Lot 5 and that this station, as well as the property adjacent thereto, were owned and fenced by the MSD. The pumping station and its perimeter fence do not appear in this illustration. We also observe that although the illustration shows only one ditch, which will be referred to herein and was referred to at trial as Ditch A, there were also two additional ditches that ran through Lot 5.

It was undisputed at trial that the Village acquired legal title to Lot 5 from the previous owners, 111 East Chestnut Corporation, in a

deed dated February 1972. Pertinent testimony and evidence regarding the Village's subsequent conveyance of the property to the MSD is set forth below with regard to whether the Village held an easement interest in Ditch A on the date of McDermott's injuries.

RECREATIONAL USE OF LOT 5

In order to show that Lot 5 had been openly used for recreational purposes on and prior to the date of his injuries, McDermott presented the testimony of Robert Bielecki of the Chicago Aerial Survey Company. Bielecki identified aerial photographs taken of Lot 5 in 1964, 1970, 1975, and 1982. Robert E. Nelson, manager of aerial services for the Sidwell Company, also identified aerial photographs of the area taken in 1979. All of these photographs were admitted into evidence without objection. In these photographs, Bielecki and Nelson identified various aspects of the area, and its borders, including roads, lakes, and paths in, near, or through the property. Bielecki and Nelson also identified certain improvements, such as roads, over the relevant years.

Other witnesses also testified at trial regarding the recreational uses of Lot 5. Fred Hall, director of park and recreation for the Palatine Park District since 1971, testified he had lived in Palatine since 1971, and that he often permitted his son to ride his bicycle on Lot 5 and allowed him to fish in the lake on Lot 5 (Lake Irene). Hall also testified that he had been in the area on several occasions and that he never saw police officers inform anyone that they had to leave.

Patrick Grealish, a commissioner for the Park District, testified that he had lived in Palatine for several years. He stated that he had been Stier's little league football coach and that Stier had been to his house for football practice. Grealish testified that he often saw children playing on Lot 5. Grealish also stated that he had walked the trails in Lot 5, including the path taken by McDermott and Stier. Grealish testified that "if you were familiar with [the ditch], you could see it." Grealish further testified that because of the vegetation around the ditch, the ditch was hard to see if a person did not know the ditch was there.

Jano, a Village police officer, testified that June 1984, he was a patrolman assigned to the field service division, and that he patrolled part of Lot 5. Jano testified that he recalled seeing people swimming in Lake Irene, but that he did not remember seeing garden plots or a baseball field on Lot 5. Jano stated that although he was instructed to keep people off Lot 5, he was also advised not to disturb persons who were walking, fishing, or riding bikes on the property. Jano further

stated that he had never patrolled the particular portion of Lot 5 on which McDermott was injured, because he was never told there were problems on this part of Lot 5 that required police patrol.

Jano also testified that he recalled seeing two "No Trespassing" signs on Lot 5. One sign was on the fence around the pumping station, and the other sign was on a metal post near the station, facing north. Both of the signs displayed the name of the MSD. Jano testified that he could not recall seeing any "No Trespassing" signs from the Village on the property. Jano also stated that he did not see any signs on Kenilworth Road and that he was not instructed to keep people off the road.

John Wente, captain of the Village fire department, testified that he lived approximately a mile from Lot 5 and used to go onto Lot 5 to ride motorcycles or go dirt biking. Wente stated that his son, who was 15 years old in 1984, also used to pursue recreational activities on Lot 5. Wente testified that he did not know about Ditch A. He also stated that he never saw people gardening, and never saw a baseball field, on Lot 5.

Allen Baker, director of the Park District at the time of McDermott's injuries, testified that the Village leased portions of Lot 5 to the Park District for garden plots on and prior to the date of McDermott's accident. He stated that, beginning in the early 1980's, the Village granted to the Park District the right to use Lake Irene for boating classes. Baker also testified that the Village granted the Park District temporary use of a portion of Lot 5 for a baseball field, and advised the Park District that the area would be regraded for the MSD's flood control project. The baseball field was installed by the Park District in 1981. Baker testified that the Park District stopped mowing the vegetation approximately 15 to 20 feet from the baseball field to the ditch, and that this unmowed area was to serve as a "buffer zone" between the baseball field and the ditch. Baker also stated that the baseball field was open to all Park District residents. Documents pertaining to these agreements were admitted into evidence, as were photographs showing the baseball field and park benches placed adjacent to the field by the Park District.

Michael Danecki, village engineer for the Village, testified that he had never been on Lot 5, and that it was not intended for public use. Robert T. Rudd, acting manager for the Village at the time of McDermott's injuries, stated that he had never gone onto Lot 5 and did not know about the Village having authorized the Park District to use portions of Lot 5 for garden plots or for a baseball field.

Diane Greenlees, the Village's deputy clerk, testified that she had searched the Village's records for any leases between the Village and the Park District. She found a 1981 lease granted from the Village to the Park District for the garden plots; this lease ran to the end of the 1981 calendar year. Greenlees testified that her search revealed that this 1981 garden plot lease was renewed for the calendar years of 1982 and 1983. Greenlees stated that she could find no renewal of the lease for the 1984 calendar year.

Harold Nehmzow, administrative aide for the Village's police department, testified that he checked the Village's police record for the period 1968 to 1984 and found no reported injuries for Lot 5 or Ditch A.

### USE OF LOT 5 IN FEDERAL FLOOD CONTROL PROJECT[1]

Several of the witnesses called at trial testified regarding a plan for construction of a flood control project that included Lot 5. This testimony was elicited from Baker, director of the Park District; Michael Danecki, village engineer for the Village; William A. Bergman, a civil engineer for the MSD; Edward V. Smetana, a right-of-way negotiator for the MSD; John Variakojis, a supervising civil engineer with the MSD; George James Batek, an engineer with Tornose Campell, a civil engineering company that provides consultation services for municipal public works improvements and that had the contract with the MSD to design the flood retention basin for the project; and Ronald Gebhardt, district conservationist in northern Cook County for the United States Department of Agriculture Soil Conservation Service (SCS).

According to the testimony of these witnesses, the Federal flood control project would include all of Lot 5, which had been acquired by the Village in 1972. Plans for the flood control project envisioned that the MSD would acquire sufficient land rights to Lot 5 in order for the MSD to undertake supervision of the construction of the flood control project. The Park District would assume ownership of the property for recreational use once construction of the flood control project was completed.

Baker, director of the Park District, testified that he went out to Lot 5 in 1982 to look over the site. Based upon this visual inspection, Baker testified that he became concerned about the safety of persons

---

[1]Additional evidence regarding the purpose and nature of this flood control project is recited below with respect to whether the Village held an easement interest in the ditch on the date of McDermott's accident.

who might fall into the ditches. Baker identified a letter he sent to the MSD, which was admitted into evidence, in which Baker expressed these concerns. In this letter, Baker stated that the ditches might be an attractive nuisance and that it would be expensive and cumbersome to mow the grass surrounding the three ditches. Baker stated in his testimony that he saw the ditch into which McDermott fell. Baker testified that there were weeds on either side of the ditch and that these weeds obstructed vision of the ditch.

Additional testimony provided by Bergman, a civil engineer with the MSD, indicated that Bergman had also visited the site in 1982 to inspect it for the project. At that time, he saw garden plots, and the baseball field, and noticed that there were people fishing or riding four-wheel vehicles. Bergman testified that he saw Ditch A, that its slope varied from gradual to nearly vertical, and that there was vegetation around the ditch.

Bergman testified that the Park District did not express a concern that the ditches were an immediate safety hazard. Bergman stated that he did not think the ditch was a safety hazard, although he did not recall the area along Ditch A where the path crossed the ditch. Bergman testified that he did not believe the ditches were an immediate hazard because the rugged, undeveloped nature of the lot alerted people that they should use more caution in travelling through the area. Bergman also testified that in his opinion, once there was a recreational facility with neatly manicured parks, the ditch might become a hazard because people would not think they would have to be so attentive. Bergman acknowledged, however, that the baseball field in 1982 looked like a neatly groomed park. In addition, Bergman acknowledged that the path was covered with weeds where it crossed Ditch A and that, therefore, the condition could be hazardous.

The three witnesses employed by the MSD who were called by McDermott to testify at trial, Bergman, Smetana, and Variakojis, gave testimony regarding the MSD's response to the letter from Baker, director of the Park District, regarding the Park District's concerns over the ditches. The testimony of these three witnesses established that an MSD memorandum dated June 28, 1982, which was admitted into evidence without objection, recorded the Park District's observations. The memorandum noted that the Park District had suggested that the ditches pose an "attractive nuisance due to abrupt and steep walls." The memorandum also observed the Park District "has insisted that this area be ameliorated preferably by enclosing the ditches in culverts." The memorandum advised that the appropriate personnel at the MSD "investigate the possibility of the current

owner correcting any safety hazards before the [MSD] takes possession of the land."

Thereafter, in an MSD memorandum dated August 16, 1982, which was admitted into evidence without objection, it was stated that "Rudd, director of community development of the Village of Palatine, the present owner, informs us that the Village would not correct the *** hazards" associated with the ditches that had been specified by the Park District. Smetana, a right-of-way negotiator for the MSD, testified that he had contacted Rudd, the Village's acting manager, about correcting the hazard of the ditches on Lot 5. Smetana testified that Rudd stated that Village would not correct the hazard, although Smetana did not know why the Village refused to do so. Smetana acknowledged that, in a handwritten note, Smetana had indicated that Village "could not" correct the hazard. Rudd, acting manager for the Village at the time of McDermott's injuries, testified that he had no recollection of the MSD having contacted him about the ditches on Lot 5.

The testimony of Bergman, Smetana, and Variakojis further indicates that the MSD then considered the possibility of excluding the ditches from the MSD's land rights acquisition of Lot 5, but that this option was later rejected as unfeasible. Thereafter, the MSD contacted the SCS and communicated the Park District's concerns. The MSD suggested to the SCS that the ditches be replaced with buried culverts and that this construction be funded as part of the flood control project. The SCS approved the placement of buried culverts in the ditches and agreed to fund the costs associated with this work. In November 1982, the MSD informed the Park District and the Village that the SCS had agreed to pay for buried culverts in place of the ditches.

With respect to the construction schedule of the flood control project, Danecki, the Village's engineer, stated that he had a conversation with Bergman, a civil engineer with the MSD, on approximately February 21, 1984. In this conversation, Danecki was advised that the MSD anticipated that a tentative starting date for construction of the flood control project was June 1984, and that construction would be completed in December 1986. Danecki testified that construction did not start until after McDermott's June 1984 accident.

EVIDENCE REGARDING COSTS TO REPAIR ALLEGED HAZARD OF DITCH A

With regard to the costs to remedy the alleged hazards of Ditch A, Bergman, the MSD civil engineer, stated that he ran a preliminary cost estimate on August 30, 1982, which was admitted into evidence

without objection. In this estimate, Bergman calculated that it would cost approximately $82,645 to place culverts in all three of the ditches on Lot 5. Bergman also estimated that it would cost $230 to regrade the slopes along Ditch A, and that it would cost $13,575 to culvert a portion of Ditch A and regrade the remaining exposed slopes along the ditch.

Harry A. Laman, Jr., testified that he was employed to provide sales and estimating services for Peerless Erectors Co., which was in the business of selling chain link fences. Laman stated that the company by which he was employed also installed a chain link fence around the entire area when the MSD began its flood control project. Laman testified that his company installed a perimeter fence around the site in the fall of 1985. Laman also testified that it would cost approximately $2,600 to $2,800 to install a chain link fence along both sides of a 300-foot ditch, and that a plastic hazard fence, also known as a snow fence, would be less expensive. Laman testified that in his experience, no one had ever asked for a fence around a drainage ditch.

John R. Solon testified that he was general manager of Semmerling Manufacturing Co., which supplied the fencing material to Peerless for the MSD's flood control project. Solon testified that in the course of his experience and knowledge in the fencing industry, ditches can and have been fenced on both sides for safety purposes.

### TRIAL COURT RULINGS AT CLOSE OF EVIDENCE, JURY VERDICT, AND TRIAL COURT JUDGMENT

At the close of all the evidence, the trial court ruled that the Village held legal title to Lot 5 on the date of McDermott's injuries, that the MSD held equitable title on the date of the incident, and that the Village held an easement in Ditch A. The trial court so instructed the jury prior to closing arguments.

The jury returned a verdict in favor of the Park District and against McDermott. The jury's verdict also found in favor of McDermott and against the MSD and the Village. In its verdict, the jury assessed McDermott's total damages at $16 million. It determined that the Village was 67% liable for McDermott's injuries, and that the MSD was 33% liable.

Shortly before the return of the jury's verdict, McDermott advised the trial court that he had settled with the MSD and the Park District during jury deliberations. The trial court determined, following a hearing held after the jury trial was completed, that these settlements were made in good faith, and entered judgment notwith-

standing the verdict in favor of the MSD with respect to McDermott's claims against the MSD. Thereafter the Village filed a lengthy post-trial motion, which the trial court denied following a hearing.

The Village appeals, raising numerous challenges to the judgment entered by the trial court.

## I

The trial court held that the Village could be found liable for McDermott's injuries because the court determined that the Village held legal title to Lot 5, the MSD held equitable title to Lot 5, and the Village retained an easement interest in Ditch A. On appeal, the Village does not dispute that it held legal title to Lot 5 on the date of McDermott's accident. However, the Village claims that it held no easement interest in the ditch. The Village further asserts that even if it did hold an easement interest in the ditch, this property interest is legally insufficient to impose a tort duty upon the Village in the instant cause.

In general, an easement is defined as "a right or a privilege in the real estate of another [citation]." (*Beloit Foundry Co. v. Ryan* (1963), 28 Ill. 2d 379, 388, 192 N.E.2d 384.) An easement can be created by an express grant in the deed of conveyance. (See, *e.g.*, *Chicago Title & Trust Co. v. Wabash-Randolph Corp.* (1943), 384 Ill. 78, 85, 51 N.E.2d 132.) Although no precise language is required to create the express grant of an easement, the words used must clearly show an intention by the grantor to confer an easement, and the terms of the grant must be definite, certain and unequivocal. (*Friedman v. Gingiss* (1989), 182 Ill. App. 3d 293, 295, 537 N.E.2d 1067; *Aebischer v. Zobrist* (1977), 56 Ill. App. 3d 151, 155, 371 N.E.2d 1003.) The instrument granting the easement should be construed according to the intentions of the parties, considering the circumstances at the time of the conveyance, including the nature of the interest conveyed and the objective of the conveyance. *Briarcliffe Lakeside Townhouse Owners Association v. City of Wheaton* (1988), 170 Ill. App. 3d 244, 254, 524 N.E.2d 230.

In considering whether the Village retained an easement interest in Ditch A by virtue of the Village's April 1983 quitclaim deed, we turn first to the language of this document of conveyance. The testimony of record revealed that the deed was executed in order to satisfy the SCS requirement for the flood control project plan that the

MSD acquire land rights to Lot 5 from the Village.[2] The deed recited that the conveyance was subject to:

"the following which shall be convenants running with the land and be binding on all successors in title:

1. Covenants, conditions and restrictions of record;

2. Public and utility easements;

3. The Grantor's existing utilities presently located within the property herein which are adversely affected by the [flood control project] will be altered or relocated at the Grantee's cost and expense to locations designated by the Grantor, subject to the approval of the Granteee, said approval not to be unreasonably withheld.

4. The Grantor will be given the opportunity to review and approve the final recreation plans, if any, for the property encompassed in the [flood control project], said approval not to be unreasonably withheld, and the parties will negotiate in good faith with respect to any disagreements or disputes.

5. And that upon demand by the Salt Creek Rural Park District said property be reconveyed by the Metropolitan

---

[2]The record reflects that the parties stipulated to the authenticity of numerous documents relating to this conveyance of title to Lot 5. In addition, at a hearing outside the presence of the jury, the MSD elicited the testimony of Jeff Harris, an attorney with Foran, Wiss, and Schultz, the law firm that drafted the 1983 quitclaim deed conveying title in Lot 5 from the Village to the MSD. The testimony of Harris, as well as numerous documents to which the parties stipulated authenticity, set forth in detail the ensuing difficulties encountered by the MSD in its efforts to register the 1983 quitclaim deed upon its execution by the Village.

To briefly summarize this evidence, it was shown that the 1983 quitclaim deed originally executed by the Village was found to contain an error in the legal description of the property. It was also discovered that the property was apparently encumbered by a mortgage. Although the Village executed a corrected quitclaim deed reciting the proper legal description of the property, the Park District refused to accept conveyance of title to Lot 5 from the MSD until the mortgage encumbrance was removed.

Eventually, in March 1986, Harris learned that Lot 5 was not encumbered by a mortgage. He so advised the Village, the Park District, and the MSD, and proceeded to prepare and assemble the necessary documents for closing. Thereafter, in a quitclaim deed dated June 10, 1986, the MSD conveyed title to Lot 5 to the Park District. The deed recited that the conveyance was subject to convenants, conditions and restrictions of record, as well as public and utility easements. It also reserved a permanent flood control easement for the MSD with respect to the design, construction, and operation of the flood control project. The record reflects that both the Village's quitclaim deed to the MSD and the MSD's quitclaim deed to the Park District were accepted for registration in the Torrens office on June 18, 1986.

Sanitary District of Greater Chicago to the Salt Creek Rural Park District, subject to the reservation by the Metropolitan Sanitary District of Greater Chicago of a permanent easement for flood control purposes; provided however, that if the Salt Creek Rural Park District does not accept said conveyance within 180 days from this date, said property will revert to the Village of Palatine for purposes of conveyance to the Metropolitan Sanitary District of Greater Chicago *** "

In light of the plain language of the 1983 quitclaim deed, we conclude that the Village retained an express utility easement in Ditch A. It is noteworthy that the deed contained language that explicitly reserved "public and utility easements." The Village does not dispute that a storm water drainage ditch used by a municipality as part of its municipal storm water drainage system is a utility. (See Ill. Rev. Stat. 1989, ch. 24, pars. 11—109—1, 11—110—1 (municipal powers include provision and regulation of storm water drainage to residents of municipality).) In addition, the Village's 1983 quitclaim deed to the MSD expressly reserved in the Village the right to review and approve plans for alteration or relocation of "utilities" on Lot 5. The Village does not dispute that one such "utility" governed by this provision was Ditch A, into which McDermott fell.

The testimony of the Village's engineer, Danecki, further supports our determination that the Village reserved an express easement in Ditch A in the Village's 1983 quitclaim deed to the MSD. In his trial testimony, Danecki identified the official Village atlas of utilities, including storm sewers, that are owned by the Village. The atlas also showed privately owned storm sewer lines that connected to Village utilities. Danecki testified that this atlas showed that on Lot 5, there were three drainage ditches, including Ditch A, as well as a water main and a sanitary sewer. Danecki testified that the drainage ditches on Lot 5 had been owned and maintained by the Village since 1972, and were used to convey storm water drainage from Kenilworth Road to Lake Irene. Danecki acknowledged that Ditch A was "essential" to the Village's storm water drainage system, since the ditch served to convey water from Kenilworth Road to Lake Irene. Danecki specifically testified that the ditch "collected storm water from the Village storm sewers and conveyed it to the lake."

In addition, Danecki testified at trial that the buried culverts, which the MSD later arranged to have installed during the flood

control project in place of Ditch A and which the SCS agreed to fund, would not carry any storm water for the MSD, and that Ditch A only carried storm water for the Village. He also stated that the Village continued to use Ditch A for this purpose after the Village "gave up control of" Lot 5 to the MSD. Danecki also identified a memorandum he had written on February 17, 1984. This document was admitted into evidence without objection. In the memorandum, Danecki recommended approval of MSD plans for Lot 5, including the placement of buried culverts in Ditch A.

The Village maintains that it did not need to retain an easement interest in Ditch A in order to ensure that the ditch would be used for municipal storm water drainage once the flood control project was completed. The Village contends that the MSD's flood control project would incorporate Ditch A and thereby protect the Village's interest in continued use of Ditch A for municipal storm water drainage.

The record reflects the following with respect to the purposes of the flood control project, derived from the testimony of Baker, director of the Park District; Bergman, civil engineer for the MSD; Smetana, right-of-way negotiator for the MSD; Variakojis, supervising civil engineer with the MSD; Batek, engineer with the civil engineering company that designed the flood retention basin for the project; and Gebhardt, district conservationist in northern Cook County for the SCS. According to the testimony of these witnesses, the SCS agreed to fund the flood control project in 1974. Testimony from these witnesses revealed that the objective of the flood control project was to protect areas upstream and downstream from Lake Irene and the East Lake. Both of these lakes were manmade upon the construction of Route 53 in 1964 by the United States Department of Transportation. In order to reduce flooding of houses and businesses upstream and downstream from the lakes, the project would control the flow of water at various points along Salt Creek and regrade the slopes of the lakes to allow for their expansion during periods of potential flooding.

These witnesses also identified a design criteria document, submitted by the MSD and approved by the SCS in 1980, which was admitted into evidence without objection. This document "describe[d] the basic engineering requirements for the design" of the flood control project, and specified that the project would include, inter alia, the construction of a peripheral drainage system. With respect to the peripheral drainage system, the document stated:

"A peripheral drainage system will be provided to prevent flooding of adjacent areas due to the reservoir construction and to convey intercepted flows. The peripheral drainage system will also provide outlets for any existing tiles, storm sewers and culverts that enter the site. Drainage on the site may be provided by inlets, storm sewers, and swales."

The witnesses testified that Ditch A was not needed to serve the intended functions of the flood control project. Baker, of the Park District, testified that the Park District had nothing to do with maintenance of Ditch A, and that the ditch never carried storm water for the Park District. Bergman, a civil engineer with the MSD, testified that the MSD did not need Ditch A for its planned flood control work. Variakojis, supervising civil engineer with the MSD, testified that Ditch A on Lot 5 had "nothing to do with flood control." Batek, of the civil consulting engineering firm that developed the design drawings and specifications for the MSD, testified that the ditch had "nothing to do with flood control." Gebhardt, with the SCS, testified that Ditch A on Lot 5 was not necessary for the flood control project, and that the ditch served merely to convey storm water for the Village and its residents. Gebhardt specifically testified that Ditch A was incorporated into the project's peripheral drainage system in order to facilitate local drainage, not to promote any objective of the flood control project.

■ Based upon this testimony at trial, the record established that the purpose of the flood control project was to regulate the flow of water both upstream and downstream from the lakes on Lot 5, and that Ditch A had "nothing to do" with the flood control project. In light of this evidence of record, we are unable to conclude that the Village had no need, in light of all of the surrounding circumstances, to retain an easement interest in Ditch A.

■ The Village also argues that because the trial court found that it held an implied easement in Ditch A, we are precluded from reviewing on appeal whether the deed reserved in the Village an express easement. We cannot agree. This court is empowered to affirm on any basis appearing in the record, regardless of the precise ground upon which the trial court's judgment is founded. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382, 387, 457 N.E.2d 9; *Padilla v. Vazquez* (1991), 223 Ill. App. 3d 1018, 1027, 586 N.E.2d 309.) Accordingly, we are not prevented, on appeal, from considering whether the Village retained an express easement in Ditch A.

■ The Village also contends that because the certificate of title issued by the Torrens office did not specifically enumerate that the Village retained a public utility easement in Ditch A, McDermott could not prove that the Village held an easement interest in Ditch A. The Village further asserts that it could not have held an easement interest in Ditch A on the date of McDermott's injuries, since on that date the Village still retained legal title to Lot 5. These arguments were not presented to the trial court, however, and are therefore waived on appeal. See, e.g., Moehle v. Chrysler Motors Corp. (1982), 93 Ill. 2d 299, 303, 443 N.E.2d 575.

The Village claims that even if it did retain an easement interest in Ditch A, this easement interest is legally insufficient to impose a tort duty upon the Village to repair and maintain the ditch so as to guard against injuries to third persons passing over the ditch.

■ Illinois case law and statutory law have adopted a broad concept of who is a "possessor of land" for purposes of imposing premises liability. (See generally Restatement (Second) of Torts §328E (1965) (defining "possessor of land" for premises liability).) Generally, Illinois decisions recognize that a defendant entitled to the use and control of property has a duty to exercise the appropriate standard of care in the repair and maintenance of the property, in order to guard against foreseeable injuries to a third party proximately caused by an unreasonably dangerous condition on the property. See Simpson v. Byron Dragway, Inc. (1991), 210 Ill. App. 3d 639, 645, 569 N.E.2d 579 (defendant does not owe duty to plaintiff "if defendant does not control or intend to control the land"), citing Collins v. Mid-America Bag Co. (1989), 179 Ill. App. 3d 792, 794, 535 N.E.2d 48; see also Rowe v. State Bank (1988), 125 Ill. 2d 203, 228, 531 N.E.2d 1358, citing Restatement (Second) of Torts §352 (1965) (vendor of real property may be held liable in tort for personal injuries sustained on premises by third party while vendor remains in possession and control of property).

In addition, the Illinois Recreational Use of Land and Water Areas Act states that the term "owner" "includes the possessor of any interest in land, whether it be a tenant, lessee, occupant, the State of Ilinois and its political subdivisions, or person in control of the premises." Ill. Rev. Stat. 1989, ch. 70, par. 32(b); see generally Comment, 5 Loy. U. Chi. L.J. 669, 674-75 (1974); Annot., 48 A.L.R.3d 1027 (1973 & 1990 Supp.); cf. Wendt v. Myers (1974), 59 Ill. 2d 246, 319 N.E.2d 777 (seller of land pursuant to installment

contract, who exercised no control or possession of the property, not an "owner" under Illinois Dramshop Act).

■ Based upon this precedent, the pertinent inquiry is whether the Village's retention of an easement interest in Ditch A entitled the Village to the use and control of the ditch, such that the Village could be held liable in tort for its alleged failure to properly repair and maintain the ditch. The evidence of record established that the Village's easement interest in Ditch A entitled the Village to use the ditch and to exercise some control over the ditch. In the 1983 quitclaim deed, the Village retained the right to use Ditch A for storm water drainage, and the Village retained the right to control the manner in which the MSD would alter the ditches on Lot 5 as part of construction of the flood control project. Danecki, the Village's engineer, testified that the Village continued to use Ditch A to convey municipal storm water from Kenilworth Road to Lake Irene in June 1984, and that he had approved the MSD's plans for the placement of buried culverts in Ditch A during construction of the Federal flood control project. Consequently, the evidence of record demonstrates that the Village had the use and control of Ditch A on the date of McDermott's injuries.

The Village claims that it could not, as the holder of an easement interest in Ditch A, undertake any measures to repair or maintain the ditch. We disagree. "The owner of the easement must be allowed to do such things in the way of repairs as to make the easement reasonably usable." (*Page v. Bloom* (1991), 223 Ill. App. 3d 18, 22, 584 N.E.2d 813, citing *Sell v. Finke* (1920), 295 Ill. 470, 479, 129 N.E. 90.) "The owner of an easement has not only the right but the duty to keep the easement in repair." (*Page*, 223 Ill. App. 3d at 22-23; see also *Flower v. Valentine* (1985), 135 Ill. App. 3d 1034, 1039-40, 482 N.E.2d 682.) As the holder of an easement interest in Ditch A, the Village had "not only the right but the duty" to repair and maintain the ditch.

■ We are unable to conclude that the imposition of a tort duty upon the Village to exercise reasonable care in its use and control of Ditch A to protect against foreseeable injuries to third persons would be unreasonable under the facts of record. In determining whether to impose a duty upon a defendant, the court must consider the following factors: (1) the foreseeability of the injury; (2) the likelihood of injury; (3) the magnitude of placing the burden upon the defendant to guard against the injury; and (4) the consequences of placing that burden upon the defendant. *Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 140-41, 554 N.E.2d 223.

■ According to the evidence of record, we conclude that it was reasonably foreseeable that a person such as McDermott, who was riding a bicycle along the path, would not see the ditch because of the weeds growing in and near the ditch, and that as a result the bicycle rider would fall into the ditch, sustaining personal injuries. The record discloses that the ditch into which McDermott fell was surrounded by weeds that were approximately two feet high. The ditch itself, at the point where it intersected with the dirt path, was approximately three feet wide and six feet deep. It was uncontradicted at trial that persons commonly used the area for bicycle riding, and that the dirt path was used to go to and from Kenilworth Avenue and the baseball field maintained by the Park District. See *Kirnbauer v. Cook County Forest Preserve District* (1991), 215 Ill. App. 3d 1013, 576 N.E.2d 168.

In addition, the cost of various remedial measures suggested by McDermott, such as posting a warning sign to alert persons to the presence of the ditch, regrading that portion of Ditch A that had steep slopes, or mowing the weeds that surrounded Ditch A, would not have been excessive, particularly in view of the potential for significant injury that could result if someone were to fall into the ditch. Moreover, these remedial measures offered by McDermott would not have materially interfered with the MSD's use of Lot 5 in construction of the Federal flood control project.

■ We also find no reversible error in the trial court's response to the jury's question during deliberations with respect to which defendant had "control" of the ditch on the date of McDermott's accident. According to the record, during the jury's deliberations, the jury sent the trial court judge the following question: "On an easement, who is responsible for the ditch itself, the siding of the ditch and the area on top of the ditch?" The judge wrote the following response to the jury: "At the time of this occurrence, defendant, [MSD], had control of the area around ditch A but not so as to interfere with the drainage use and purpose of ditch A by the Village ***. Defendant, Village ***, had control of the use of ditch A and that part of ditch A including its sides necessary for drainage purposes." The Village objected to this response, arguing that the jury should have simply been informed that the questions of responsibility and duty were addressed in the instructions.

The Village maintains that the trial court's response was incorrect because the Village, as the holder of an easement interest, did not have the power to repair or maintain the ditch. As we have

noted above, however, the easement interest retained by the Village did grant to the Village the power to repair and maintain the ditch.

The Village further claims that the trial court's response assumes facts not in evidence, since there is nothing in the record to show whether the use of the ditch for drainage required the use of the entire ditch, or only a portion of the bottom of the ditch. It is well established that the owner of an easement is entitled to the use of so much of the land as is reasonably necessary under the circumstances. (*Ogilby v. Donaldson's Floors, Inc.* (1958), 13 Ill. 2d 305, 148 N.E.2d 758; *Flower v. Valentine* (1985), 135 Ill. App. 3d 1034, 482 N.E.2d 682.) Use of the ditch for drainage necessarily required the entire ditch, not simply the bottom portion through which the draining water would run. We find the Village's argument insufficient ground to disturb the judgment entered by the trial court in the case at bar.

## II

The Village also contends that the judgment against it should be reversed, because the evidence introduced at trial did not demonstrate that the Village was guilty of willful and wanton misconduct for its alleged failure to correct the condition of Ditch A or to warn of the dangers of Ditch A. The Village further asserts that the evidence at trial was insufficient to prove that the Village's alleged willful and wanton misconduct was a proximate cause of McDermott's accident.

Willful and wanton acts are those which display a reckless disregard for the safety of others, and include the failure to use ordinary care to guard against an impending danger. A defendant is willful and wanton when he has actual or constructive knowledge that his acts, or his failure to act, create a high probability that others will incur serious physical harm, and the defendant nevertheless recklessly disregards this danger. It is the province of the finder of fact to determine whether a defendant is liable for willful and wanton behavior, based upon the particular circumstances of the case. *Burke v. 12 Rothschild's Liquor Mart, Inc.* (1992), 148 Ill. 2d 429, 451, 593 N.E.2d 522; *Loitz v. Remington Arms Co.* (1990), 138 Ill. 2d 404, 416, 563 N.E.2d 397; *Lynch v. Board of Education of Collinsville Community Unit District No. 10* (1980), 82 Ill. 2d 415, 430, 412 N.E.2d 447; *Schneiderman v. Interstate Transit Lines, Inc.* (1946), 394 Ill. 569, 583, 69 N.E.2d 293.

■■ Our review of the record reveals sufficient evidence to justify the jury's determination that the Village's failure to remedy the

condition of Ditch A was willful and wanton. According to the evidence of record, the Village knew or should have been aware that Ditch A, at the point where it intersected with the dirt path from Kenilworth Road, could be a hazard to those using the dirt path. The MSD communicated this concern to the Village several months before McDermott's injuries. There was conflicting evidence that the Village responded that it either "would not" or "could not" remedy this hazard, and it was the function of the jury to resolve this conflict. The evidence of record also contains testimony from which the jury could reasonably have concluded that the Village was aware that Lot 5 was often used for recreational purposes, and that the dirt path was used to gain access from Kenilworth Road to the baseball field on Lot 5.

In light of these circumstances, the record supports the jury's conclusion that the Village had actual or constructive knowledge that the concealed condition of Ditch A, where it crossed the dirt path, created a high probability that one using the dirt path could fall into the ditch and thereby sustain substantial physical injury, and that the Village nevertheless failed to undertake any measure to remedy this danger.

We are also not persuaded by the Village's assertion that the hazards associated with Ditch A were open and obvious. The Village argues that the evidence showed that Ditch A was not concealed by weeds and other vegetation. The Village notes that Bergman, the MSD's civil engineer, testified that the nature of the vegetation surrounding the ditch, as compared to the type of vegetation growing farther away from the ditch, would alert one using the path that there was a ditch. However, the testimony of McDermott, Stier, Baker, and Grealish established that the ditch was not readily visible because it was surrounded by weeds and vegetation. The record thus contains conflicting testimony in this respect, and it was the province of the jury to resolve this disputed trial issue. See, e.g., Doser v. Savage Manufacturing & Sales, Inc. (1990), 142 Ill. 2d 176, 568 N.E.2d 814.

The Village also claims that natural conditions which interfere with visibility, such as darkness or foliage, are their own warnings of a potential hidden danger. However, the Illinois Supreme Court has acknowledged that a ditch may be unreasonably dangerous where its presence is concealed by weeds or other vegetation. (See Corcoran v. Village of Libertyville (1978), 73 Ill. 2d 316, 383 N.E.2d 177.) The cases cited by the Village are factually distinguishable from the instant cause. (Guenther v. G. Grant Dickson &

*Sons, Inc.* (1988), 170 Ill. App. 3d 538, 525 N.E.2d 199; *Mazzeffi v. Schwanke* (1977), 52 Ill. App. 3d 1032, 368 N.E.2d 441; see also *Ziemba v. Mierzwa* (1991), 142 Ill. 2d 42, 50, 53, 566 N.E.2d 1365.) In those decisions, it was held that a defendant driver should have reasonably foreseen that weeds or vegetation would obstruct his vision and prevent him from seeing the plaintiff, who came into the path of the defendant driver's vehicle and sustained injuries. In the instant cause, the record does not show, as a matter of law, that McDermott should have reasonably foreseen that the weeds and other vegetation along the path he was riding would conceal the ditch into which McDermott fell.

The Village further asserts that its allegedly willful and wanton misconduct did not proximately cause McDermott's injury. The Village claims that there is no evidence of record to establish what caused McDermott to fall into Ditch A. We cannot accept this argument, however.

 Proximate cause is established where there is a reasonable certainty that the defendant's wrongful acts caused the plaintiff's injuries. Proximate cause cannot be founded on conjecture, surmise, or speculation. (See, *e.g., Kalata v. Anheuser-Busch Cos.* (1991), 144 Ill. 2d 425, 437, 581 N.E.2d 656; *Schultz v. Hennessy Industries, Inc.* (1991), 222 Ill. App. 3d 532, 540, 584 N.E.2d 235.) McDermott testified that he never saw Ditch A as he was riding along the dirt path from Kenilworth Road. Stier testified that he only was a few feet from the ditch when he first saw it. Baker and Grealish, of the Park District, stated at trial that the ditch was not readily visible because it was concealed by weeds. This evidence was sufficient for the jury to conclude that McDermott's injuries were proximately caused by the concealed condition of Ditch A.

III

The Village contends that the judgment should be reversed, because the evidence showed that McDermott was at least partially contributorily negligent. The Village also complains that the trial court should have admitted evidence offered by the Village to show that McDermott was contributorily negligent because the bicycle he was riding did not have brakes.

We note that the Village's arguments on these points are premised on the assumption that the jury could compare McDermott's contributory negligence against the Village's willful and wanton misconduct. However, in *Burke v. 12 Rothschild's Liquor Mart, Inc.* (1992), 148 Ill. 2d 429, 593 N.E.2d 522, the Illinois Supreme Court

held that a jury cannot offset the plaintiff's recovery for the defendant's willful and wanton misconduct by a percentage representing the plaintiff's contributory negligence. See *Burke*, 148 Ill. 2d at 451-52.

■■ In light of the supreme court's ruling in *Burke*, the jury in the instant cause could not consider McDermott's contributory negligence as an offset against the Village's tort liability, since the Village was found liable based upon principles of willful and wanton misconduct. As a result, we reject the Village's arguments that McDermott should have been found contributorily negligent, or that the Village was prejudiced by the court's exclusion of evidence regarding the lack of brakes on the bicycle McDermott was riding at the time of his accident.

## IV

The Village claims that the trial court violated its constitutional right to procedural due process when the court rendered certain rulings that, according to the Village, prevented the Village from adequately defending itself at trial.

The record reflects a lengthy procedural chronology of the instant cause. As pertinent to the issues raised by the Village in this appeal, the record indicates that in February 1985, McDermott filed his first complaint, naming the Village, the MSD and the Park District as defendants. McDermott alleged in this pleading that the defendants were negligent and willful and wanton for their failure to repair or maintain the ditch. The liability of each defendant was predicated on the allegation that each had owned the property on the date of McDermott's accident.

McDermott filed amended complaints in January and February 1986. In these amended pleadings, McDermott alleged *inter alia* that the defendants operated, maintained and controlled Lot 5, and that they were guilty of willful and wanton misconduct for their failure to guard against the dangers of Ditch A, to warn of the hazards associated with Ditch A, and their failure to culvert or fence the ditch. During this time, in responses to written interrogatories, the MSD detailed the documentary history of the Village's 1983 conveyance of Lot 5 to the MSD for the flood control project, and the difficulties encountered with respect thereto. In 1987, McDermott voluntarily dismissed his claims against the Village without prejudice. McDermott subsequently explained to the trial court that this dismissal was undertaken because it appeared, at the time of the voluntary dismissal,

that the MSD would admit to its ownership of Lot 5 on the date of McDermott's injuries.

In September 1987, McDermott filed a motion to accelerate discovery and advance the cause for trial. McDermott explained in this motion that his medical bills were escalating and that a change in his mother's employment, in conjunction with McDermott's reaching majority in a few months, would greatly reduce his ability to satisfy the costs of his on-going medical care (then estimated in the motion at $15,000 per month). The trial court set the matter for the trial docket of June 1988.

In early 1988, McDermott filed amended complaints. His fourth amended complaint, filed in April 1988, included allegations against the Village, as well as allegations against the Park District and the MSD. In this fourth amended complaint, McDermott alleged in pertinent part that each of the defendants owned and exercised control and maintenance of Lot 5. He alleged that the defendants were willful and wanton for their failure to fence or culvert Ditch A, and for their failure to warn of or protect against the hazards associated with the ditch. The Village responded with a motion to dismiss, claiming that because it had been voluntarily dismissed, McDermott could only replead against the Village by filing a new, separate suit against the Village alone. The trial court allowed the Village's motion to dismiss, and McDermott filed a separate complaint against the Village. This complaint repeated the pertinent allegations made against the Village in McDermott's previous pleading. The trial court rescheduled the June 1988 trial date previously set by the court.

In July 1988, the Village filed a motion to dismiss McDermott's complaint for failure to state a claim for which relief could be granted. McDermott responded to the motion to dismiss, and also filed a first amended complaint against the Village. The trial court denied the Village's motion to dismiss. The trial court also allowed McDermott's motion to consolidate his complaint against the Village with his suit against the MSD and the Park District, overruling the Village's objections to this consolidation. In the first amended complaint against the Village, McDermott alleged that the Village owned, controlled and maintained Lot 5 on the date of his injuries. He also alleged that the Village was guilty of willful and wanton misconduct because it permitted an unreasonably dangerous condition in Ditch A to exist on Lot 5.

In August 1988, the Village filed a motion to reset the cause for trial, requesting additional time to undertake discovery and to respond to the third-party contribution claims that had been filed

against it by the Park District and the MSD. The trial court allowed this motion and reset the cause for a progress call in November 1988. Also in August 1988, McDermott filed a fifth amended complaint against the Village, the MSD, and the Park District. In this pleading, McDermott alleged that all of the defendants owned, exercised control of, and maintained Lot 5. He alleged that each of the defendants was willful and wanton for its failure to barricade or fence Ditch A, failure to enclose the ditch in culverts, failure to warn of the hazards of Ditch A, and failure to protect against the dangers associated with the ditch. McDermott also alleged that the Village owned a public easement in Ditch A on the date of his injuries, and claimed that the Village was guilty of willful and wanton misconduct in its use of this easement interest by failing to undertake the measures specified above.

In November 1988, the Village filed a motion to dismiss this pleading, and the MSD filed a motion for summary judgment. The Park District also filed a motion for summary judgment in December 1988.

In February 1989, McDermott filed a sixth amended complaint against the defendants. In this pleading, McDermott alleged that either one or more of the defendants owned Lot 5 and that each of them exercised control of and maintenance over the property on the date of his injuries. He alleged that the defendants were willful and wanton for their failure to guard, barricade or fence Ditch A, their failure to enclose the ditch in a culvert, their failure to warn of the hazards of the ditch, and their failure to take any measure to protect against the dangers of the ditch. McDermott also alleged that the Village held an easement in Ditch A, with the same alleged failures as previously stated. The pleading further alleged that the Village was guilty of willful and wanton misconduct for its failure to provide proper ingress to and egress from the baseball field located on Lot 5.

The Village filed a motion to dismiss this complaint for failure to state a claim for which relief could be granted. The trial court allowed the motions of the Park District and the MSD to consider their motions for summary judgment as applicable to McDermott's sixth amended complaint.

Thereafter, in March and April 1989, the Village filed motions to dismiss the sixth amended complaint. Before the court ruled on these dismissal motions, McDermott filed a seventh amended complaint against the Village, the Park District, and the MSD. McDermott's seventh amended complaint, filed May 1, 1989, alleged that the Village, the MSD and the Park District exercised control of and mainte-

nance over Lot 5, and that the defendants were willful and wanton because they failed to guard, fence, enclose in culvert, warn of hazard, or take any measure to protect against the dangers associated with Ditch A.

The Village filed a demand for a bill of particulars with regard to this seventh amended complaint. McDermott filed an answer to the demand on May 10, 1989. The trial court granted the Village time in which to file a motion to dismiss in light of this response from McDermott, which the Village filed on May 22, 1989.

Also in May 1989, the trial court allowed the motions of the MSD and the Park District to consider their motions for summary judgment as applicable to McDermott's seventh amended complaint. Following a hearing, Judge Dean Sodaro determined that on the date of McDermott's accident, the Village held legal title to Lot 5, the Park District held equitable title to Lot 5, and the MSD held an easement interest in Ditch A. Both the MSD and the Park District filed motions to reconsider this ruling.

Based upon McDermott's response to the Village's demand for a bill of particulars, the Village filed another motion to dismiss the seventh amended complaint on June 9, 1989. The trial court dismissed all but one of McDermott's allegations against the Village. In this remaining allegation, McDermott averred that the Village was liable based upon the Village's provision of police protection for Lot 5 on the date of McDermott's accident. Thereafter, on June 27, 1989, the Village filed a motion for summary judgment.

The cause was then assigned to Judge Lerner for trial. The MSD and the Park District filed motions to reconsider Judge Sodaro's rulings with respect to ownership of Lot 5. Pursuant to Judge Lerner's order, the parties filed briefs on the issues of ownership, title, and control of the ditch on the date of McDermott's accident. Following briefing and a hearing, Judge Lerner allowed the motions to reconsider and vacated Judge Sodaro's rulings with regard to ownership of Lot 5. Judge Lerner determined that disposition of this issue required the presentation of factual evidence that the parties could offer during trial, and reserved ruling on the question until the close of the evidence. Judge Lerner overruled the Village's objections to his reconsideration of Judge Sodaro's previous ruling.

Judge Lerner also allowed McDermott to file an eighth amended complaint. The trial court overruled the Village's objections that McDermott should be limited to his allegation that the Village was liable because of its provision of police patrol of Lot 5. In his eighth amended complaint, filed on June 28, 1989, McDermott alleged that

each of the defendants controlled and maintained Lot 5, and that they were willful and wanton because they failed to fence, culvert, warn, provide protective measures, provide safe means of ingress/egress and provide a permiter sign showing private property. The trial court permitted the Village to file a demand for a bill of particulars from McDermott regarding the Village's possession, control, and maintenance of Lot 5.

On July 3, 1989, the Village filed a motion to continue trial in the cause, and again objected to a reconsideration of Judge Sodaro's rulings regarding ownership of Lot 5. The trial court denied this motion, and granted McDermott leave to file a response to the Village's demand for a bill of particulars.

Trial of the cause began on July 5, 1989, with jury selection. Opening statements of counsel were made to the jury the following day. McDermott presented the testimony of Bielecki and Nelson regarding aerial photographs of Lot 5 on July 7, 1989, as well as the testimony of Baker, Director of the Park District. On the next day of trial, July 10, 1989, McDermott elicited testimony from Danecki, the Village's engineer. At the close of Danecki's testimony, the court allowed McDermott's motion to file a written response to the Village's demand for a bill of particulars. Based upon this response, the Village filed a motion to dismiss the eighth amended complaint. The trial court reserved ruling on this motion to dismiss.

At the completion of McDermott's case in chief, the trial court allowed McDermott's motion to file a ninth amended complaint. The court overruled the Village's objections that it would be unduly prejudiced by the filing of this amended pleading during the course of trial. In his ninth amended complaint, filed July 20, 1989, McDermott alleged that all of the defendants owned and exercised possession, control and maintenance of Lot 5 on the date of his injuries. He alleged that the defendants were guilty of willful and wanton misconduct because of their failure to fence, culvert, or warn of the ditch, and because of their failure to provide protective measures, safe ingress/egress, or a private property sign on the property. In an additional count, McDermott alleged that the Village held a utility easement in Ditch A on the date of his injuries.

At the close of all of the evidence, the trial court denied the Village's motion to dismiss McDermott's complaint, and allowed the Village's motion to file an answer to McDermott's pleading. Thereafter, the trial court denied the Village's post-trial motion that the court's various trial rulings had violated the Village's right to procedural due process.

Upon review, the Village argues that it was deprived of procedural due process by the following trial court rulings: (a) vacation of Judge Sodaro's interlocutory determination regarding the defendants' ownership of Lot 5; (b) allowance of McDermott's motion to file his eighth amended complaint shortly before trial began; (c) refusal to delay trial until (i) McDermott filed a response to the Village's demand for a bill of particulars, (ii) the Village filed and obtained a ruling on its motion to dismiss the eighth amended complaint, and (iii) the Village filed an answer to McDermott's complaint; and (d) allowance of McDermott's motion to file his ninth amended complaint during trial. The Village further contends that each of these errors, considered cumulatively, also deprived it of a fair trial.

The Illinois Supreme Court has explained the concept of procedural due process as follows:

"Due process entails an orderly proceeding wherein a person is served with notice, actual or constructive, and has an opportunity to be heard and to enforce and protect his rights. [Citation.] A fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information. [Citations.] Due process does not require useless formality in the giving of notice [citation], requiring only reasonable assurance that notice will actually be given and the person whose rights are to be affected will be given reasonable time to appear and defend [citation]. There must be an opportunity, at a meaningful time and in a meaningful manner, for a hearing appropriate to the nature of the case. [Citation.]" *Stratton v. Wenona Community Unit District No. 1* (1990), 133 Ill. 2d 413, 432-33, 551 N.E.2d 640.

Bearing in mind these principles, we consider each of the Village's arguments *seriatim*.

A. TRIAL COURT'S VACATION OF INTERLOCUTORY ORDER
REGARDING OWNERSHIP

The Village maintains that Judge Lerner should not have vacated Judge Sodaro's prior ruling with respect to the defendants' ownership of Lot 5 on the date of McDermott's accident. The Village asserts that Judge Lerner's ruling prejudiced the Village because it promoted uncertainty in the litigation with regard to the Village's basis for lia-

bility. According to the Village, Judge Lerner's actions "allowed the case against the Village to swing wildly without a set point of axis at the expense of that orderliness of proceedings guaranteed by due process."

We are unable to accept the Village's claim that it was deprived of due process when Judge Lerner vacated the interlocutory order of Judge Sodaro with regard to which defendant held title to, ownership of, or an easement in, Lot 5 on the date of McDermott's accident. A trial court judge is fully empowered to vacate the interlocutory ruling of a prior trial court judge in a cause. (See, *e.g., Rowe v. State Bank* (1988), 125 Ill. 2d 203, 531 N.E.2d 1358.) The Village was given notice of the motions to reconsider filed by the MSD and the Park District, and the Village was provided ample opportunity to respond to those motions. The circumstance that Judge Lerner's ruling was contrary to the position taken by the Village did not deprive the Village of procedural due process.

Contrary to the Village's claims, our review of the record does not reveal that Judge Lerner's vacation of Judge Sodaro's prior interlocutory order caused the trial to "swing wildly without a set point of axis" or that the trial court judge permitted "the trial to proceed without establishing new guideposts to replace those being ignored *** despite the parties' wishes." The transcript indicates that when Judge Lerner entertained the motions to reconsider filed by the MSD and the Park District, Judge Lerner advised the parties that he was going to "treat it [the question of ownership of Lot 5] as an open question to be determined during the course of trial." The trial judge further informed the parties that he thought "what is going to be more critical in determining duties in this case will be the possessory interest at the time of the occurrence, who has the right of possession and any other possessory interests that could pertain from which a duty would flow *** on the date of this occurrence." Consequently, Judge Lerner explicitly advised the Village that he would allow the parties to offer evidence regarding their possession and control of Lot 5 on the date of McDermott's accident, and that he would consider this evidence in determining the defendants' ownership of Lot 5, and thereby their respective tort duties to McDermott, as well as the defendants' liability if any for his injuries. As a result, the record does not justify the Village's characterization of the trial proceeding as one devoid of notice to the Village of the nature of the claims being considered against the Village.

The Village also asserts that the trial court's rulings erroneously permitted the jury to hear irrelevant and prejudicial evidence regard-

ing the activities on Lot 5 over a 12-year period, communications between the MSD and the Village regarding Ditch A, and the Village's leasing of portions of Lot 5 to the Park District for a baseball field and garden plots. However, this evidence was relevant to show the recreational uses of the property, and to demonstrate whether the defendants had knowledge of the hazards allegedly associated with Ditch A to recreational users of Lot 5.

B. ALLOWANCE OF McDERMOTT'S FILING OF EIGHTH
AMENDED COMPLAINT

The Village maintains that it was deprived of due process because the Village was "forced" to trial before it was adequately informed by a sufficiently definite complaint of the claims the Village was to meet and defend against. In this regard, the Village contends that McDermott should not have been permitted to file the eighth amended complaint, because it "altered radically the legal structure of the case to be tried against the Village." According to the Village, the case "changed from a narrow and specific one" involving provision of police patrol to a "completely unbounded and undefined claim." The Village asserts that the eighth amended complaint, which was "unparticularized in regard to the Village, left the Village to guess" what McDermott would "assert in the manner in which [the Village], as a non-owner, supposedly possessed, maintained and controlled Lot 5." According to the Village, it was "bewildered" and "perplexed because during the relatively short time between the refiling of the action against it in 1988 ***, and assignment for trial some months later ***, [McDermott] filed four different amended complaints." The Village asserts that each "amended complaint shifted the basis of the claim against the Village" and that there "was no constancy that could inform the Village as to what" McDermott's "assertions against it would be."

We can find no reversible error in the trial court's allowance of McDermott's motion to file an eighth amended complaint shortly prior to trial. According to the record, McDermott's pleadings alleged that the Village either owned, controlled, possessed, or maintained Ditch A, and that the Village was guilty of willful and wanton misconduct for failing to undertake certain specified measures that allegedly would have prevented McDermott's injuries. None of the amended complaints filed before trial constituted a "radical departure" from McDermott's earlier pleadings. The record here demonstrates that the pleadings filed against the Village gave it adequate notice of McDermott's claims against the Village.

We note that it is well established that a trial court may allow a plaintiff to amend a pleading prior to final judgment where such amendment will not cause undue prejudice to the defendant. (*Ryan v. Mobil Oil Corp.* (1987), 157 Ill. App. 3d 1069, 510 N.E.2d 1162.) In the instant cause, the trial court specifically asked the Village what prejudice would accrue to it because of the filing of the amendments. The Village was unable to define to the trial court the specific prejudice that would occur by allowance of the amendment.

In light of these considerations, we cannot say that the Village was deprived of procedural due process when the trial court allowed McDermott to file an eighth amended complaint shortly before trial began.

C. TRIAL COURT FAILURE TO DELAY TRIAL

The Village claims that the trial court should have delayed trial until certain matters had been filed by the parties and resolved by the court. The Village asserts that the failure to continue trial caused the Village to defend itself without adequate notice of the precise claims and defenses the Village would raise at trial.

Specifically, the Village contends that the trial court erred when it did not delay trial until McDermott had responded to the Village's demand for a bill of particulars with respect to McDermott's eighth amended complaint. According to the Village, the court's ordering of a response to the bill of particulars acknowledged that the complaint was "so wanting in details" that it did not fairly apprise the Village of the specific facts and theories of the case. The Village contends that when "a bill of particulars is due *** the complaint is not in a complete state and ready to be answered or tried until it has been received." The Village asserts that while it was awaiting McDermott's response, McDermott was nevertheless permitted to present the testimony of witnesses and that the Village was "left to intuit as best it could what would be claimed against it as distinct from the other defendants." The Village contends that witnesses "left the stand, opportunity to cross-examine them closed, before any particulars informed the Village of what, if any, import that testimony bore to the Village."

The record does not support the Village's claim that it was deprived of procedural due process because McDermott filed a response to the Village's demand for a bill of particulars after trial had already begun. The transcript indicates that, when McDermott provided his response to the bill of particulars, the Village voiced no objection thereto, nor did the Village enumerate to the trial court any

prejudice it sustained by the timing or content of the response given by McDermott.

Moreover, the record indicates that only a few witnesses had testified before McDermott filed his written response to the demand for the bill of particulars. These witnesses were Bielecki and Nelson, who testified regarding the aerial photographs of Lot 5; Baker of the Park District, who testified regarding the Park District's involvement in the flood control project, the Park District's leasing of portions of Lot 5 for a baseball field and garden plots, and his own inspection of Lot 5; and Danecki, the Village's engineer. We are unable to conclude that the Village was denied an adequate opportunity to cross-examine these witnesses, since the Village did not request of the trial court that it be permitted to further examine these witnesses in view of the responses given by McDermott in his bill of particulars.

In addition, although the Village asserts that the court's order that McDermott file a response to the Village's demand for a bill of particulars was an indication that McDermott's pleading was insufficient, the Village did not argue to the trial court that the response given by McDermott was inadequate to apprise the Village of the bases for McDermott's claims against the Village. Under these circumstances, we determine that the Village's arguments on appeal in this regard are an inadequate basis to disturb the trial court's judgment. See, e.g., *Village of Pawnee v. Knostman* (1983), 115 Ill. App. 3d 842, 450 N.E.2d 1272.

The Village further complains that the trial court should have delayed trial until the court had ruled upon a motion to dismiss filed by the Village in response to McDermott's bill of particulars with regard to the eighth amended complaint. The Village also claims that when the trial judge denied the motion at the close of McDermott's case in chief, the judge did so "out of hand" and "without hearing any argument." The Village further contends that it was deprived of its right to file a section 2—619 motion to dismiss the complaint.

The record does not indicate, however, that the Village sought the court's permission to file a section 2—619 motion to dismiss the complaint. Accordingly, we are not prepared to hold that the Village was deprived of due process on this ground. In addition, the denial of a continuance request does not deprive a party of procedural due process, and due process does not require that the court entertain oral argument on a motion to dismiss. (*Meyerson v. Software Club of America, Inc.* (1986), 142 Ill. App. 3d 87, 491 N.E.2d 150; *LaBoy v. Zuley* (N.D. Ill. 1990), 749 F. Supp. 184.) The trial court's decision to delay ruling upon the Village's section 2—615 motion to dismiss obli-

gated the Village to defend at trial with respect to all of McDermott's allegations against the Village. Because the trial court's actions did not deprive the Village of a reasonable opportunity to present its arguments with respect to the sufficiency of McDermott's allegations, we are unable to conclude that the Village was deprived of procedural due process in this respect.

■■■ The Village also contends that it was "forced" to defend itself at trial without being accorded the opportunity to file an answer to the complaint prior to the start of trial. The Village claims that it was therefore "forced to trial before it *** had a proper opportunity to answer the complaint and form issue." However, the procedural chronology of the case at bar, as set forth more fully above, demonstrates that the Village was amply aware of the issues put in dispute between McDermott and the Village. Given these considerations, the Village was not deprived of procedural due process on this ground.

D. McDERMOTT'S FILING OF NINTH AMENDED COMPLAINT

■■■ The Village also challenges the trial court's allowance of McDermott's motion for leave to file a ninth amended complaint at the close of all of the evidence. The Village contends that this filing permitted a "significant shift" in McDermott's case against the Village, and did not conform to the evidence that had been heard. The record belies the Village's assertions, however. The ninth amended complaint added the allegation that the Village had possession of Lot 5, and included a count reflecting the trial court's ruling that the Village held an easement in Ditch A on the date of McDermott's injuries. We find no procedural due process violation in the trial court's allowance of McDermott's request to file the ninth amended complaint.

E. CUMULATIVE ERROR

■■■ We are unable to conclude that the Village was deprived of procedural due process based upon cumulative alleged defects. The record demonstrates that the Village was originally named as a defendant in February 1985. It remained as a party to the litigation during the following year, and was voluntarily dismissed by McDermott in 1987 when it appeared that the MSD was the owner of Lot 5 on the date of McDermott's accident.

Thereafter the Village was again named as a party defendant in April 1988. During the following 16 months, the cause was continued on the trial call in order to permit the Village to undertake discovery and to review discovery materials in the possession of the MSD and the Park District. The Village also filed motions to dismiss and re-

sponded to third-party contribution claims filed against it by the MSD and the Park District.

The record indicates that the Village was also given notice of the motions for summary judgment filed by the MSD and the Park District, and filed briefs with the trial court with respect to the Village's arguments on the defendants' ownership interests in Lot 5. The Village was fully notified of Judge Sodaro's interlocutory order on this issue, and was apprised of the motions to reconsider filed by the MSD and the Park District.

The record further reveals that Judge Lerner gave full attention to the Village's argument that it should not reconsider Judge Sodaro's interlocutory ruling. In rejecting this argument, the trial court noted that the Village had had ample opportunity to undertake discovery. The court further stated that if evidence were offered during trial that unfairly surprised the Village, the court would consider the exclusion of such evidence. The record also reflects that the court advised the Village that it would be permitted the opportunity to depose any additional witnesses not previously questioned by the Village, should the Village request such opportunity. The Village made no argument during the course of the trial that any specific evidence came as a surprise to the Village, nor did the Village request of the court the opportunity to depose any witnesses or review any additional discovery evidence. The trial court's refusal to delay trial pending McDermott's response to the Village's demand for a bill of particulars, and until the Village had filed a motion to dismiss and thereafter an answer to McDermott's complaint, did not cause the Village to be unaware of what claims were made against the Village. The ninth amended complaint reflected rulings made by the trial court following notice to the Village of the court's intention to consider the question of the defendants' interests in Lot 5 and Ditch A, and the Village's arguments with respect thereto.

Based upon our review of the record, we are unable to conclude that the Village was deprived of procedural due process in the instant cause. Although due process requires that all parties "receive[ ] a fair and timely hearing in accordance with the applicable circumstances," due process "does not require a rigid or generic formula," but rather relies upon flexible procedures dependent upon the particular circumstances of each case. (*Bank of Aspen v. Fox Cartage, Inc.* (1989), 126 Ill. 2d 307, 317, 533 N.E.2d 1080; see also *In re Marriage of Korte* (1990), 193 Ill. App. 3d 243, 247, 549 N.E.2d 906.) The pertinent cases cited by the Village are distin-

guishable, as in each decision a party was deprived of due process because the trial court failed to provide the party any opportunity to present its claims to the trial court. See *Lakeview Trust & Savings Bank v. Estrada* (1985), 134 Ill. App. 3d 792, 480 N.E.2d 1312; *Gorin v. McFarland* (1967), 80 Ill. App. 2d 398, 224 N.E.2d 615; *Pettigrew v. National Accounts System, Inc.* (1966), 67 Ill. App. 2d 344, 213 N.E.2d 778.

V

The Village also complains of the trial court's finding that a settlement agreement between McDermott and the MSD was in good faith. Under the Contribution Among Joint Tortfeasors Act (Ill. Rev. Stat. 1989, ch. 70, par. 301 *et seq.*), a tortfeasor who has settled with the plaintiff in good faith is discharged from all liability for contribution to any other tortfeasor. (Ill. Rev. Stat. 1989, ch. 70, pars. 302(c), (d).) To determine whether the settlement agreement has been reached in good faith, the court must consider all of the circumstances surrounding the agreement. *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 499 N.E.2d 1373.

With respect to the parties' pertinent settlement negotiations, the record shows that after the cause was set for trial, the MSD extended an irrevocable offer that guaranteed McDermott a minimum of $100,000, on the condition that McDermott agree not to execute in excess of $1 million on any judgment he might obtain against the MSD. Thereafter, during jury deliberations, McDermott advised the court that he had settled with the MSD. Specifically, McDermott's counsel informed the court that the MSD's agreement amounted to "$1 million [which] would be $500,000 plus a $500,000 loan agreement." The court reserved ruling on whether this settlement agreement was in good faith. McDermott also informed the court that he had accepted the Park District's offer to settle for $1.65 million, and this settlement agreement is not challenged by the Village on appeal.

Following return of the jury's verdict and the MSD's filing of a motion for judgment notwithstanding the verdict because of the settlement agreement between the MSD and McDermott, the court permitted the Village to undertake discovery of the circumstances surrounding the MSD's settlement agreement. In responses to written interrogatories, both the MSD and McDermott represented that the MSD's $500,000 loan to McDermott was to be repaid upon McDermott's recovery of that sum from the Village, if any such recovery from the Village were forthcoming. McDermott and the

MSD also stated in their responses to written interrogatories that the previous "high-low" covenant not to execute above $1 million, which the MSD had extended shortly after trial had begun, had been tendered for a consideration of $100,000. The MSD and McDermott represented that this first "high-low" agreement had been superseded by the eventual settlement between McDermott and the MSD reached during jury deliberations.

Under the Contribution Act, a settlement is considered *prima facie* in good faith when the settling party shows that it is supported by consideration. (*Wilson v. Hoffman Group, Inc.* (1989), 131 Ill. 2d 308, 321, 546 N.E.2d 524; *Melzer v. Bausch & Lomb, Inc.* (1989), 193 Ill. App. 3d 59, 62, 549 N.E.2d 817.) Once this *prima facie* showing is made, a presumption arises that the settlement agreement is valid, and the challenging defendant must show by clear and convincing evidence that the settlement agreement was not in good faith. (*Jachera v. Blake-Lamb Funeral Homes, Inc.* (1989), 189 Ill. App. 3d 281, 285-86, 545 N.E.2d 314.) Lack of good faith has been generally considered to be tortious or wrongful conduct on the part of the settling party that amounts to fraud or collusion. (*Jachera*, 189 Ill. App. 3d at 286.) The trial court's determination that a settlement agreement was reached in good faith may be disturbed on appeal if it is an abuse of discretion. (*Banks v. R.D. Werner Co.* (1990), 201 Ill. App. 3d 762, 773-74, 559 N.E.2d 217.) This deference accords due regard for the court's familiarity with and observation of the course of the proceedings prior to the execution of the settlement agreement. *Snoddy v. Teepak, Inc.* (1990), 198 Ill. App. 3d 966, 969, 556 N.E.2d 682.

The Village contends that the MSD's settlement agreement with McDermott should be set aside because the MSD was not candid in its representations to the trial court regarding the $500,000 loan extended by the MSD to McDermott. The Village argues that the MSD's motion for judgment notwithstanding the verdict failed to make any reference to the $500,000 loan agreement, and that this loan agreement was only revealed in response to written interrogatories submitted by the Village in its discovery of the circumstances surrounding the settlement negotiations between the MSD and McDermott.

█ The trial court determined that the MSD's failure to refer to the loan agreement in its motion for judgment notwithstanding the verdict did not establish a lack of good faith, and on appeal we cannot say that the trial court's determination was manifestly erroneous. The record indicates that the MSD explained to the trial

court, during oral argument with respect to the MSD's motion for judgment notwithstanding the verdict, that the MSD did not refer to the loan agreement in its motion because the MSD did not believe that the loan constituted "consideration" supporting the settlement agreement. The MSD did not deny the existence or nature of the loan agreement. We also note that the trial court was already aware of the loan agreement, since it was promptly revealed to the court during jury deliberations when the settlement agreement was first reached between the MSD and McDermott. Given these circumstances, we are unable to conclude that the MSD's failure to refer to the loan agreement in its motion for judgment notwithstanding the verdict is sufficient to prove by clear and convincing evidence that the MSD engaged in tortious or wrongful conduct amounting to fraud or collusion that would be sufficient to invalidate its settlement agreement with the MSD.

 The Village also argues that the MSD misrepresented to the trial court the nature of the original, superseded "high-low" agreement offered by MSD shortly after trial had begun. The Village asserts that the MSD originally advised the trial court that this "high-low" agreement was merely a firm offer that would remain "on the table" during trial. According to the Village, the MSD later represented in its responses to written interrogatories following trial that the "high-low" agreement was a firm contract that had been accepted by McDermott and subsequently superseded by the eventual settlement agreement of $500,000 plus a $500,000 loan. Our review of the trial transcript reveals that the MSD and McDermott originally advised the court that the "high-low" offer from the MSD had been accepted by McDermott, and as a result, we find no material discrepancy between the representations made by MSD or McDermott with respect to this original offer.

 The Village claims that the settlement agreement with the MSD should been held invalid because the amount agreed to was only a small fraction of the amount that was both reasonably expected and actually awarded by the jury. The disparity upon which the Village relies is not sufficient ground to disturb the settlement agreement, however. Public policy favors the compromise of claims in good faith, and acknowledges that it is "the essence of settlement negotiations [that a] party either compromises in return for the certainty of a fixed result, or gambles that he will obtain a more favorable result by submitting the case to a jury. [Citation.]" (*Cleveringa v. J.I. Case Co.* (1989), 192 Ill. App. 3d 1081, 1086, 549 N.E.2d 877.) In the instant cause, the MSD elected to settle McDer-

mott's claims prior to verdict in exchange for a set amount of damages to be paid by the MSD. The circumstance that the MSD's eventual liability pursuant to the jury's verdict would have been much greater does not void the MSD's settlement agreement with McDermott, and our courts have declined to utilize a "proportionality" or "reasonable range" test in order to determine whether a defendant's settlement with a plaintiff, when compared to the jury's subsequent verdict, was made in good faith. See, *e.g., Johnson v. Belleville Radiologists, Ltd.* (1991), 221 Ill. App. 3d 100, 104, 581 N.E.2d 750; *Pritchard v. SwedishAmerican Hospital* (1990), 199 Ill. App. 3d 990, 998, 557 N.E.2d 988; *Christmas v. Hughes* (1989), 187 Ill. App. 3d 453, 455, 543 N.E.2d 274; see generally Perona & Murphy, *Good Faith Settlement Under the Contribution Act: Do Trial Courts Have Too Much Discretion?*, 20 Loy. U. Chi. L.J. 961 (1989).

█ The Village further argues that the eventual settlement agreement between McDermott and the MSD should be held invalid because it greatly increases the Village's liability for the damages suffered by McDermott in the instant cause, and because the MSD is equally capable, in view of its liability insurance, to pay more than that provided for in the settlement agreement. There is nothing in the Act which creates an exception with respect to, or imposes special or additional requirements upon, settlement agreements entered into by municipalities, nor do the provisions of the Act or its judicial interpretations consider the defendants' relative abilities to pay as a factor in determining whether a settlement agreement has been made in good faith. Consequently, we decline to create such exceptions or requirements in the case at bar.

The Village claims that each of the assertions it raises as set forth above, when considered cumulatively, demonstrate that the MSD's settlement agreement was made in "unconscientious advantage" of the Village, thereby showing bad faith on the part of the MSD and McDermott. The Village argues that the MSD was not a truly adversarial party to the litigation, but rather was engaged in "collusion" with McDermott to target the Village. The Village claims that this collusive activity began with the first settlement, which had been reached prior to opening arguments, and culminated in the second settlement, reached during jury deliberations. The Village asserts that the second settlement, announced while the jury was deliberating, was a reward for the MSD's efforts during trial that aided McDermott's claims against the Village. The Village argues that the true objective in the settlement negotiations was to

retain the MSD as a "sham" defendant and to improperly shunt to the Village an excessive amount of the jury's eventual verdict.

██ The trial court rejected the Village's arguments in this regard, and our review of the record does not reveal sufficient basis to disturb the trial court's determination. Although the Village attempts to ascribe ulterior motives to McDermott's acceptance of the MSD's settlement offer, we cannot concur in such characterization. McDermott elected to accept the MSD's certain offer of $500,000 at a point in time when the jury was still deliberating its claims and the outcome of the trial was therefore in doubt. McDermott did not know at the time of settlement whether he would recover any damage award from any of the defendants, and had no reasonable assurance that any of the defendants would be held liable. By settling with the MSD and the Park District, McDermott ran the risk that the settlement amount he received from these two defendants would be all that he could recover.

We are also unable to accept the Village's assertion that the MSD was acting in a collusive manner by settling with McDermott. Because of this settlement agreement, the MSD was relieved of its potential liability to McDermott as well as its potential contribution liability to the Village. It is not a lack of good faith for a defendant to settle with the plaintiff even though one purpose may be to purchase protection against a claim for contribution. (*Christmas v. Hughes* (1989), 187 Ill. App. 3d 453, 456, 543 N.E.2d 274.) In addition, the settlement with McDermott caused the MSD to forfeit its right to challenge the sufficiency of the evidence against it, or to question trial court rulings which had rejected its legal and factual defenses. We also note that the transcript indicates that the MSD fully participated in the trial proceeding, and actively defended itself against the claims put forth by McDermott.

The trial court was a continuous observer with respect to all of the matters raised by the Village, and was in a better position to evaluate the Village's objections. We find the Village's arguments an inadequate basis to disturb the trial court's determination that the settlement agreement between McDermott and the MSD was executed in good faith.

██ The Village also asserts that it should be entitled to a setoff for the $500,000 loan agreement between McDermott and the MSD. No such setoff is appropriate, however, since it was agreed that the funds are a loan, to be repaid by McDermott upon his recovery of such sums from the Village. We are similarly unpersuaded that the Village should receive a $100,000 setoff for the original

"high-low" agreement, as it was superseded by the subsequent settlement in the amount of $500,000.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

JOHNSON and LINN, JJ., concur.

APPENDIX A