2023 IL App (2d) 220389-U
No. 2-22-0389
Order filed July 6, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| LUZ CARRILLO TARANGO, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 20-L-25 |
| | ) | |
| THE VILLAGE OF CARPENTERSVILLE, | ) | Honorable |
| | ) | Kevin T. Busch, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Kennedy concurred in the judgment.

**ORDER**

¶ 1    *Held*: Question of fact existed as to whether a street pothole that was partially obscured and shaded by a parked vehicle was an open and obvious condition. Therefore, we reverse the order of the circuit court granting summary judgment in favor of defendant and remand for further proceedings.

¶ 2    Plaintiff, Luz Carrillo Tarango, appeals the order of the circuit court of Kane County granting summary judgment in favor of defendant, the Village of Carpentersville (Village), in this negligence action stemming from injuries plaintiff received when she stepped into a street pothole that was shaded by, and immediately located behind, her parked vehicle, as she attempted to load items into the trunk of her vehicle. On appeal, plaintiff contends that an issue of material fact

exists regarding whether the defect was open and obvious and that the circuit court misapplied the distraction exception to the open and obvious rule. Because we agree with plaintiff's first argument, we reverse and remand.

¶ 3                                I. BACKGROUND

¶ 4      On August 25, 2019, plaintiff fell and injured her right ankle after she stepped into a pothole located behind her parked vehicle. On that date, in the mid-afternoon, she drove from her home in Elgin to visit her mother, Maria Altamirano, at her home located on Four Winds Way, in the Village of Carpentersville. Plaintiff was raised in the home, and she moved out when she was an adult. Plaintiff's friend, Samantha McManis, accompanied her. Four Winds Way is a residential street that permits vehicle parking on both sides of the street.

¶ 5      After about a 30-minute drive, plaintiff pulled up to her mother's house and parked in front, "right alongside" the curb. She parked on the same side of the street as the home, "[t]owards the front of the driveway." Plaintiff could not recall whether her vehicle dipped into a pothole as she parked. Plaintiff exited her vehicle, stepped onto the street, rounded the front of the vehicle, and approached the home, together with McManis. They walked up the sidewalk adjacent to the driveway and entered the home. Plaintiff did not notice any potholes or depressions on Four Winds Way that day, prior to her fall, including when she drove on it, parked, exited her vehicle, or when she approached the home. She could not recall whether the condition of the roadway had changed since she was last there, which was one month earlier.

¶ 6      Several hours later, while it was still daylight, plaintiff exited the front door of the home and walked across the lawn at an angle toward the rear of her parked vehicle. McManis exited the house and walked some distance behind her. Plaintiff was holding her car keys and carrying "two [plastic grocery] bags on each side," which were filled with clothes. When plaintiff was

approximately halfway to her vehicle, she pressed a button on her car keys which caused the trunk lid of her vehicle to open. Plaintiff crossed over the concrete sidewalk adjacent to the curb and roadway. As she reached the rear of the vehicle, with her eyes on the open trunk lid, plaintiff stepped off of the sidewalk with her right foot down to the street. She did not directly look at the area where she was about to step. Then, plaintiff's entire size-seven foot stepped into a pothole "at the rear passenger's side tire" of her vehicle. Her foot went into the pothole, which was filled with loose, dark colored gravel, "about the depth of [her] foot," which was "about 4 inches." Plaintiff immediately felt a sharp, throbbing pain in her ankle. She fell to her right side, and the "corner of [plaintiff's] butt" came to a rest on the sidewalk.

¶ 7      Plaintiff observed the pothole immediately after she fell, while she was still seated on the sidewalk. The pothole abutted the curb and consisted of a darkened depression that measured, in plaintiff's estimation, four to five inches deep, seven inches wide, and more than 12 inches long. Plaintiff had parked her car over part of the pothole, and she had stepped into the portion of the pothole that her vehicle was not covering. The floor of the pothole consisted of a layer of loose gravel or asphalt. Plaintiff testified that there was a "newer," "fresh patch" of asphalt "right next" to the pothole. The pothole and the newer asphalt patch were "dark" as compared to the surrounding road surface. Plaintiff believed that even if she had looked directly at the street prior to stepping, it would have been difficult to appreciate the presence of the pothole or its depth due to the shadows cast by her vehicle and a nearby tree, the contour of the street itself, and the position of her parked vehicle. "The street appeared to be even" or "leveled," because the area was "shaded" and "blended together, so it just looked like a regular street." Plaintiff did not observe the pothole before she stepped down from the sidewalk, but she agreed that nothing obstructed her view of the portion of the pothole before her fall.

¶ 8      Prior to plaintiff's fall, her most recent trip to her mother's home was in July 2019.  Before that, plaintiff had last visited in "[p]ossibly April" of 2019.  At neither time did plaintiff notice any potholes or depressions in front of the home.  She visited her mother's home approximately five times in 2018, and she likewise did not notice anything about the condition of the roadway any of those times.  In her answers to defendant's interrogatories, plaintiff acknowledged that, prior to her fall, she was aware that there were roadway depressions on Four Winds Way that had been repaired by the Village in early 2019, before her injury.  When pressed during her deposition, plaintiff testified that, prior to her fall, her sister, Karolina, informed her that someone who lived at the home had called the Village and complained about the condition of the roadway and that, before her fall, "[t]here was a patch on the road."  Plaintiff denied having prior knowledge of the pothole prior to fall.

¶ 9      During plaintiff's discovery deposition, plaintiff was questioned regarding several photographs of the street.  Plaintiff testified that she took the photo that was marked as Exhibit No. 1, but she could not recall when she took it.  The photo depicts a portion of the road surface abutting the curb and sidewalk in front of the home of plaintiff's mother, as well as the home itself.  Several neighboring homes can be seen in the distance.  Some of the street appears cracked, and a large repair patch that is darker in color than the rest of the street surface abuts the curb.  A dark shadow also abuts the curb some 30 feet from the vantage point of the camera, which plaintiff circled as the area in which she parked her vehicle.  Plaintiff agreed that the photo depicted the hole that caused her to fall, but she disagreed that it truly and accurately depicted the area as it looked on August 25, 2019, because "[t]he hole is deeper" and because her car was not parked on the street in the photo.  "It looked different after the accident."  When presented with a photograph marked Exhibit No. 2, plaintiff testified that she could not recall whether she took the photo, and she denied

that it accurately depicted the area on which she fell on August 25, 2019. She was asked no further questions regarding this photo.

¶ 10 Group Exhibit No. 3 consisted of several photos of a roadway depression with what appears to be a white, plastic stick across it and a tape measure extending from the stick down into the base of the depression. Plaintiff testified that she did not take the photographs and did not know who did. Plaintiff was not asked whether any of the photos in Group Exhibit No. 3 fairly and accurately depicted the pothole that caused her injury. Plaintiff was next shown two photographs marked as Group Exhibit No. 4, and she denied taking the photos or any knowledge of who took them. She was not asked any other questions regarding this group exhibit.

¶ 11 Concerning Exhibit No. 5, plaintiff testified that she took the photo "[a] couple of months after the incident." The photo was captured from the perspective of someone standing on the roadway, in front of the home of plaintiff's mother. Plaintiff agreed that "immediately next to the sidewalk area," there was "a broken area with gravel and other sort of debris *** adjacent to the curbing." There was also a "fresh patch of asphalt" adjacent to the "broken area," which appeared "darker" as compared to the road surface. Plaintiff testified that the "hole area" "look[ed] like it's a little bit deeper," because it appeared to be "probably six or seven" inches deep, whereas the hole that caused her injury was, by plaintiff's estimation, four to five inches deep. Still, Exhibit No. 5 "look[ed] like what [plaintiff] fell in." The final photograph that plaintiff testified to was Exhibit No. 6. The photo appears to depict the same area as Exhibit No. 5, but it was taken from a closer vantage point. It depicts a dark patch of asphalt mostly surrounded by cracked asphalt that is lighter in color, which also abuts a gravelly, broken asphalt area that is adjacent to the curbing. Plaintiff testified that she took this photo "about two months" after she fell, and that, although "the depression seem[ed] deeper," the photo was "the closest" and depicted "how it looked" when she

fell. Plaintiff testified that Exhibit No. 6 depicted the hole that caused her to fall, but it "blend[ed] in," and she could not actually perceive any depression or pothole in the photo.

¶ 12    Plaintiff's sister, Irma Cruz, testified that she was at her mother's house on August 25, 2019, and, as she was looking out the kitchen window, she observed plaintiff fall. She testified that plaintiff exited her mother's house with McManis, and they proceeded to "walk[] down the yard," "[t]o the sidewalk and then to the street to get to [plaintiff's] vehicle." Then, "[w]hen [plaintiff] went to go step on the street, [Cruz] saw [plaintiff] go to the right, and [Cruz] saw that [plaintiff] fell on the ground." Cruz did not actually see plaintiff's foot go into the pothole because the hole was not visible from her perspective. After plaintiff fell, Cruz told her mother to get some ice, and she and McManis tended to plaintiff. Plaintiff was given ice to put on her ankle by her mother, and plaintiff remained on the sidewalk for five to ten minutes before attempting to stand, with assistance from Cruz and McManis. Cruz testified that the pothole was not "easily seen," because the shadow from the trees caused it to "blend[] in with the concrete." Cruz did not know the "[s]pecific spot" or the "exact area on the street" where plaintiff fell, but her understanding was that "[it] was a pothole in the street." She believed that plaintiff had parked her vehicle on the street in such a way that it was "partly blocking the pothole, kind of over [it]." She could not recall whether the front or rear of plaintiff's vehicle covered part of the hole.

¶ 13    During her deposition, Cruz was questioned regarding a photo that was marked as "Irma Cruz Deposition Exhibit A," which is the same photo that was marked as Exhibit No. 1 during plaintiff's deposition. Cruz circled on the photo the area that she believed plaintiff fell. She did not know the "size of the pothole that [she] *** marked," but she agreed that the pothole appeared to be in the same or similar condition as it was on the date plaintiff fell. She was also shown a photograph marked as "Irma Cruz Deposition Exhibit B," which appears to depict a closer view

of the same pothole that she had previously circled in "Irma Cruz Deposition Exhibit A." The photo depicts what appears to be a white plastic stick across the width of a street depression, perpendicular to the sidewalk.[1] Cruz agreed that the hole in the photo appeared to be in the same or similar condition as when plaintiff fell. Cruz testified that she first observed the pothole depicted in "Irma Cruz Deposition Exhibit B" "maybe ten years" before plaintiff's fall, and she did not notice the hole change during that time because she did not pay attention to it. When Cruz would visit her mother, she would park on the street "either close to [the pothole] or over" it, and she did not intentionally try to avoid parking near the pothole. Cruz testified that there were other potholes on Four Winds Way that were similar to the one that plaintiff stepped in.

¶ 14    Plaintiff's mother, Maria Altamirano, testified that she had lived on Four Winds Way since 1988. Cruz lived with her at the time of plaintiff's injury. Altamirano testified that she was home on August 25, 2019, but she did not see plaintiff fall. She knew only that plaintiff "fell on the street in front of [Altamirano's] house," and that the pothole was "close to the car." She was unsure of "exactly where" it happened. During her deposition, Altamirano was shown the photo previously marked as "Irma Cruz Deposition Exhibit A." She testified that the front yard, sidewalk, and street appeared to be in the same or similar condition as on the date of plaintiff's injury. Altamirano testified that there were multiple potholes in front of her house on the date of plaintiff's injury. She did not know how long the potholes were present before plaintiff fell. Altamirano was shown "Irma Cruz Deposition Exhibit B," but she did not know whether the photo accurately portrayed the way the pothole looked when plaintiff fell.

---

[1]Plaintiff was not shown this photo at her deposition or asked any questions about it.

¶ 15    Kevin Gray testified that he was the director of public works and engineering for the Village. Gray testified that the Village contracts with MDS Technologies, Inc. to conduct periodic assessments of the Village's roadways. Following a May 2009 evaluation of the Village's roadways, MDS Technologies, Inc. rated the condition of Four Winds Way as "very poor," which was the third lowest rating out of seven possible ratings. He agreed that the rating was not predicated upon the presence of potholes, and that the prevalence of potholes was "essentially irrelevant" to the rating. Ed Szydlowski, the assistant director of public works for the Village, testified that the Village typically repairs the roadways "from the worst rating up." Szydlowski testified that streets rated as "very poor" are often repaired or resurfaced, subject to available funding.

¶ 16    On January 21, 2020, plaintiff filed an unverified two-count complaint against defendant, alleging a claim for common law negligence and a claim for willful and wanton conduct. Regarding the specifics of her accident, plaintiff alleged that she was injured after she "step[ped] in a deep and depressed area of street, by the curb, due to the existing deteriorated street surface," and that she was "unable to see and/or appreciate the danger posed by the compromised street surface due to the placement of her car." She maintained, therefore, that the Village was negligent in failing to repair, maintain, and warn of the deteriorated and depressed roadway, and that said alleged misconduct was willful and wanton. The Village filed its answer on March 13, 2020, wherein it denied that it owed plaintiff a duty of care and denied all material allegations of negligence. It also raised the affirmative defenses of tort immunity under section 3-102 of the Local Governmental and Governmental Employees Tort Immunity Act (745 ILCS 10/3-102 (West 2020)) and contributory negligence.

¶ 17    On July 22, 2022, the Village moved for summary judgment, arguing that it did not owe plaintiff a duty of care because the condition of Four Winds Way was open and obvious, and also was known to plaintiff. In other words, the Village asserted that the dangerous condition was the roadway that comprised Four Winds Way, itself, rather than the particular pothole that caused plaintiff to fall. In response, plaintiff disputed both that the pothole was open and obvious and that she had knowledge of the defect prior to her fall. She further emphasized that the Village made no argument that the subject pothole was open and obvious, but it instead "shift[ed] its argument to other depressions in the street that should have placed the Plaintiff on notice of the pothole." Plaintiff also noted that the existence of an open and obvious pothole is not an automatic bar to finding a legal duty of care, and she argued that the distraction exception to the open and obvious rule applied.

¶ 18    On October 17, 2022, after hearing argument from the parties, the trial court granted summary judgment in favor of the Village. In explaining its ruling, the court emphasized that plaintiff was familiar with the street, and it noted the size of the pothole, which was "significant enough that had [plaintiff] been looking she would have seen and appreciated the condition of the roadway and been able to take care." It also stated that the road was "obviously in relatively poor condition," because it had been repaired on many occasions and yet nevertheless contained a significant pothole that was "open and obvious to anybody who would have taken the time to look." The court also found no evidence that plaintiff was distracted as she approached her vehicle, only that plaintiff was "not paying attention."

¶ 19    Plaintiff timely appealed.

¶ 20                                    II. ANALYSIS

¶ 21    On appeal, plaintiff argues that the trial court erred in finding, as a matter of law, that the pothole was an open and obvious condition and that the distraction exception to the general rule that landowners owe no duty to guard against open and obvious dangers did not apply.

¶ 22                              A. The Standard of Review

¶ 23    Summary judgment is appropriate only where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). The purpose of summary judgment is not to try a question of fact, but rather, to determine whether a genuine issue of fact exists to be tried. *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). A genuine issue of material fact exits "where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 41. In evaluating whether a genuine issue exists, the trial court must construe the pleadings and evidentiary material in the record strictly against the movant and liberally in favor of the nonmoving party. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). "To survive a motion for summary judgment, the nonmoving party need not prove his case at this preliminary stage of litigation; however, the plaintiff must present some evidentiary facts to support each element of his cause of action, which would arguably entitle him to a judgment." *Marquardt v. City of Des Plaines*, 2018 IL App (1st) 163186, ¶ 16. Summary judgment is a drastic measure and should be allowed only when the right of the moving party is clear and free from doubt. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. "On appeal from an order granting summary judgment, a reviewing court must consider whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether summary judgment is proper as a matter of law." *Becker v. Alexian*

*Brothers Medical Center*, 2021 IL App (1st) 200763, ¶ 12 (quoting *Monson v. City of Danville*, 2018 IL 122486, ¶ 12.  We review *de novo* a trial court's grant of summary judgement.  *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992).

¶ 24                       B.  Elements of a Negligence Cause of Action and Duty

¶ 25     To sustain a negligence action, the plaintiff must present sufficient factual evidence that: (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; and (3) the plaintiff's resulting injury was proximately caused by the breach.  *Buchaklian v. Lake County Family Young Men's Christian Ass'n*, 314 Ill. App. 3d 195, 199 (2000); *Wilfong v. L.J. Dodd Construction*, 401 Ill. App. 3d 1044, 1051 (2010).  If the plaintiff fails to establish any element of a negligence cause of action, including a duty of care, summary judgment in favor of the defendant is proper.  *Becker*, 2021 IL App (1st) 200763, ¶ 13.  This is so because, "[a]bsent a duty, 'no recovery by the plaintiff is possible as a matter of law.' " *Choate v. Indiana Harbor Belt R.R. Co.*, 2012 IL 112948, ¶ 22 (quoting *Vesey v. Chicago Housing Authority*, 145 Ill. 2d 404, 411 (1991)).

¶ 26     Whether a duty exists is a question of law for the court to decide.  *Ward v. Kmart Corp.*, 136 Ill. 2d 132, 140 (1990).  In determining whether a duty of care exists, the trial court must consider whether a relationship existed between the parties that imposed a legal obligation upon the defendant for the benefit of the plaintiff.  *Kun Mook Lee*, 2019 IL App (2d) 180923, ¶ 13.  The word "relationship" serves as a shorthand description for the sum of the four factors that our supreme court has stated should be considered in evaluating whether a duty exists: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 18.  The weight to be given to these factors depends on the circumstances of each particular case.  *Id*.  The first two factors in

the above analysis are implicated if the condition is open and obvious. That is, where the condition is open and obvious, the foreseeability of the harm and the likelihood of injury will be slight and thus will weigh against imposing a duty of care. See *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 19 (citing *Bucheleres v. Chicago Park District*, 171 Ill. 2d 435, 456-57 (1996)).

¶ 27                                    C. Open and Obvious Danger

¶ 28    Under the open and obvious rule, "a party who owns or controls land is not required to foresee and protect against an injury if the potentially dangerous condition is open and obvious." *Bruns*, 2014 IL 116998, ¶ 16 (quoting *Rexroad v. City of Springfield*, 207 Ill. 2d 33, 44 (2003)). Under section 343A of the Restatement (Second) of Torts, which our supreme court has adopted, "[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." *Alqadhi v. Standard Parking, Inc.*, 405 Ill. App. 3d 14, 17 (2010) (quoting Restatement (Second) of Torts § 343A(1) (1965)). In this context, "obvious" means " 'both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising ordinary perception, intelligence, and judgment.' " *Bruns*, 2014 IL 116998, ¶ 16 (quoting Restatement (Second) of Torts § 343A cmt. b (1965)).

¶ 29    Courts recognize the open and obvious exception because it is not foreseeable to a possessor of land that an invitee would be injured when the condition or danger is open and obvious. *Kleiber v. Freeport Farm & Fleet, Inc.*, 406 Ill. App. 3d 249, 257 (2010). This doctrine applies to commonly dangerous conditions such as height, fire, and bodies of water, but it may also apply to other conditions, such as sidewalk defects. *Bruns*, 2014 IL 116998, ¶ 17. Whether a dangerous condition is open and obvious is determined by the objective knowledge of a

reasonable person rather than the plaintiff's subjective knowledge. *Buchaklian*, 314 Ill. App. 3d at 203.

¶ 30     The question of whether a hazardous condition is open and obvious may be either factual or legal, depending on whether there is a dispute as to the physical nature of the condition. If there is no dispute regarding the physical nature of the condition, whether the condition is open and obvious is a legal question for the court. *Choate*, 2012 IL 112948, ¶ 34; *Alqadhi*, 405 Ill. App. 3d at 17. If, however, "there is a dispute about the condition's physical nature, such as its visibility, the question of whether a condition is open and obvious is factual." *Wilfong*, 401 Ill. App. 3d at 1053.

¶ 31     D. Whether the Pothole was an Open and Obvious Danger as a Matter of Law

¶ 32     Here, the trial court granted summary judgement in favor of the Village because it found that the pothole that caused plaintiff to fall was an open and obvious danger as a matter of law. However, based on our review of the record, and construing the pleadings, deposition testimony, and photographs in the light most favorable to plaintiff, we cannot say, as a matter of law, that the condition posed an open and obvious danger to a reasonable person in plaintiff's position, exercising ordinary perception, intelligence, and judgment. *Bruns*, 2014 IL 116998, ¶ 16. This is so because the record amply demonstrates the existence of a genuine issue of material fact between the parties regarding the physical nature of the pothole, namely its visibility.

¶ 33     Plaintiff testified that, while it was still daylight, she exited the front door of her mother's home while carrying plastic grocery bags filled with clothes, with her keys in hand. She proceeded to walk, not down the sidewalk that she had traversed to initially enter the residence, but at an angle across the front lawn. She headed toward the rear of her vehicle because she intended to place the bags she was carrying into the trunk and, indeed, when she was approximately halfway

to her vehicle, she pressed a button on her keys that caused the trunk lid of the vehicle to open remotely. She reached the edge of the lawn and proceeded to cross over the sidewalk immediately adjacent to the curbing and roadway that comprised Four Winds Way. Looking ahead at the ajar trunk lid of her vehicle, plaintiff stepped with her right foot off the sidewalk, intending to step onto the surface of the roadway directly behind the "rear passenger's side tire." To plaintiff's surprise, her entire foot stepped into a pothole filled with dark, crushed gravel, which caused her to fall and injure her right ankle.

¶ 34    The difficulty in appreciating the presence of the hole in the instant case is similar to that of the hazard involved in *Becker*, 2021 IL App (1st) 200763. There, the plaintiff fell and was injured after she stepped onto a metal trench grate in the parking lot of a hospital. *Id*. ¶1. The grate was comprised of downward sloping gaps that varied in size, and each side of the grate included a five-inch-wide strip with a natural concrete-gray finish. *Id*. ¶ 4. The plaintiff had parked her vehicle in the parking lot early in the morning, while it was "still somewhat dark outside," and began to walk to the front entrance of the hospital. *Id*. ¶¶ 4-5. A brief moment before she fell, she saw only the vague outline of a grate, but she did not recognize that it was a grate. *Id*. ¶ 6. The plaintiff averred that the grate was "rust colored" and "blended in" with the surrounding asphalt and was difficult to see due to the dim lighting and heavy, humidity-rich air. *Id*. She likewise was unable to appreciate that the "holes angled downward instead of being flat," although she agreed that nothing obscured her vision of the grate. *Id*. A structural engineer opined that, due to the low lighting, the dark brown rust on the surface of the grate and the shaded interior of the trench "camouflaged the openings in the surface of the grating." *Id*. ¶ 7. He further opined that the large gaps and downward sloping vanes would not be obvious to a reasonably cautious pedestrian confronted with the same conditions as the plaintiff. *Id*. The trial court granted

summary judgment in the defendants' favor, reasoning that the grate was an open and obvious hazard. *Id.* ¶ 9.

¶ 35    On appeal, the *Becker* court reversed, reasoning that there was an issue of fact "concerning the visibility in dim lighting, not of the grate, but of the downward sloping gaps." *Id.* ¶ 16. Specifically, the court concluded that, construing the evidence in the light most favorable to the plaintiff, reasonable minds could conclude that the downward sloping gaps that "blended in" did not constitute an open and obvious danger because the gaps of varying sizes were not visible in dim lighting. *Id.* ¶¶ 16, 18. "Because reasonable minds could disagree on whether the downward sloping gaps of the metal trench grate were visible and an open and obvious hazard, the appropriate arbitrator of that issue is the trier of fact." *Id.* ¶ 18. See also *Buchaklian*, 314 Ill. App. 3d at 202 (question of fact existed as to whether defect in floor mat was difficult to discover based on its size, lack of significant color contrast, or short time a person has in which to discover the defect while approaching it).

¶ 36    *Alqadhi* is also informative. There, the plaintiff tripped and fell on a ¾-inch rise in the concrete of a wheelchair-accessible ramp while exiting the defendant's parking structure. The plaintiff, in challenging the defendant's motion for summary judgment based on the open and obvious rule, pointed to her own testimony at deposition that the garage had dim lighting and that the lack of color contrast in the raised concrete created the illusion of a flat walking surface. *Alqadhi*, 405 Ill. App. 3d at 15. The plaintiff conceded that she "probably would have seen the raised concrete if she had been looking downward." *Id.* at 16. The defendant contended that the curb was visible because the garage was "well lit," and that the pavement was smooth and free from defects. *Id.* The appellate court found that the visibility of the condition was in dispute, and

it therefore reversed the trial court's grant of summary judgment in favor of the defendant. *Id*. at 18.

¶ 37 Here, too, reasonable minds could disagree regarding whether the subject pothole was sufficiently visible to constitute an open and obvious hazard. Plaintiff testified that even if she had looked directly at the street prior to stepping, it would have been difficult to appreciate the presence of the pothole or its depth. Specifically, plaintiff testified that, while she was still seated on the sidewalk after her fall, she discovered that a darkened depression that was, by her estimation, four to five inches deep, seven inches wide, and more than 12 inches long, had caused her to fall. Although nothing obstructed her view of the portion of the pothole she stepped into prior to her fall, plaintiff nevertheless testified that "the street appeared to be even" or "leveled." The illusion of an "even" walking surface was, by plaintiff's testimony, the result of a combination of several factors, including the positioning of the pothole immediately adjacent to a dark and "newer," "fresh patch" of asphalt that had been used to repair a different pothole, the contour of the street itself, and dark shadows on the roadway that were cast from her parked vehicle and a nearby tree. In plaintiff's words, the street "blended together, so it just looked like a regular street." Similarly, Cruz testified that the pothole was not "easily seen," due to dark shadows cast onto the street and the fact that plaintiff's vehicle "partly block[ed] the pothole."

¶ 38 The Village disputes that the factors emphasized by plaintiff would have obscured the presence of the pothole. Instead, it contends that "the scene photos show, and the testimony confirms, that the pothole into which plaintiff stepped was adequately lit and [was] neither concealed nor subtle in nature." The Village posits that "the photographs of the scene show *** [that] the respective colors of the street and the pothole were markedly different, and that the shadows from the nearby trees and objects have no visible effect on discerning the cracks, the

pothole, or these colors." It points to three photographs, namely "Irma Cruz Deposition Exhibit B" and Exhibit Nos. 1 and 6 from plaintiff's deposition, and it states that "witnesses identified [these photos] as accurately depicting the street and pothole on the day of Plaintiff's fall." The Village's reliance on these photographs to refute plaintiff's testimony that the street appeared to be "even" or "leveled" underscores the need to submit this issue to a jury rather than decide it as a matter of law.

¶ 39    Critically, no witness other than plaintiff and her sister, Cruz, testified regarding the visibility or lack thereof of the pothole as of the date of the injury. The trial court noted this fact during the hearing on the Village's motion for summary judgment, when it observed that there was "absolutely no evidence as to its condition other than [plaintiff's] description after she fell." As noted, plaintiff *denied* that Exhibit No. 1 fairly and accurately depicted the hole because, according to her testimony, it appeared deeper in the photograph than it was on the date of her injury and her car was not parked on the street over a portion of it. She repeatedly testified that it "looked different after the accident." The Village apparently seeks to credit the testimony offered by Cruz and Altamirano that the photo accurately depicted the hole on the date of injury, rather than plaintiff's denial of the same, notwithstanding the fact that Cruz did not know the "specific spot" where plaintiff fell and was familiar only with the area that she "believe[d] plaintiff fell," and Altamirano did not observe plaintiff fall and did not know "exactly where" the pothole was. This is improper because, when faced with a motion for summary judgment, the court must not decide a question of fact, but must instead determine whether one exists. In doing so, it cannot make credibility determinations or weigh the evidence. *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 396 (2008). The second photo the Village points to, "Irma Cruz Deposition Exhibit B," was shown only to Cruz and Altamirano. Cruz agreed that the hole depicted in that exhibit was in

the same condition as it was when plaintiff fell, whereas Altamirano testified that she did not know. Plaintiff was neither shown this photo nor asked any questions regarding it. At this stage of the proceedings, the value of this exhibit in support of the Village's argument that the condition was open and obvious is therefore limited.

¶ 40    The third photo relied on by the Village is Exhibit No. 6. Neither Cruz nor Altamirano were shown this photo during their depositions. Plaintiff testified that she took the photo approximately two months after her injury and that, even though "the hole area" appeared "a little bit deeper" than on the day she fell, the photograph was "the closest" to "how it looked" on August 25, 2019. Again, Exhibit No. 6 depicts a repaired patch of asphalt that is "darker" than the surrounding road surface. It is nearly surrounded by asphalt that is lighter in color and which appears cracked throughout. Between the curbing and the dark, fresh patch of asphalt, is "a broken area with gravel," and it is this "broken area" that plaintiff alleges she stepped into at the time of her injury. Plaintiff testified that even though the photograph depicted the pothole that caused her to fall, she could not perceive any depression or hole in the photograph because the hole was filled with dark gravel and blended in with the surrounding roadway surface. We have closely reviewed Exhibit No. 6 and similarly are unable to clearly perceive a hole. See *Ballog v. City of Chicago*, 2012 IL App (1st) 112429, ¶ 31 (hazardous condition was open and obvious where gaps in the road surface were "patently visible" in the photographs contained in the record). The Village does not specify whose testimony it believes "confirms *** that the pothole into which the plaintiff stepped was *** neither concealed nor subtle in nature." As developed, the record does not support the Village's assertion because, as noted, plaintiff and Cruz both testified that the pothole was difficult to observe.

¶ 41    Our determination that the relevant deposition testimony raises a question of fact concerning the visibility of the pothole finds support in several cases.  In *McDermott v. Metropolitan Sanitary District*, 240 Ill. App. 3d 1, 9, 11 (1992), a boy was severely injured when, while riding his bicycle along a dirt path, he fell into a storm water drainage ditch that was five to six feet deep.  The plaintiff brought suit against the Village of Palatine and alleged willful and wanton conduct for failure to properly maintain the ditch or warn of the hazards associated with it.  *Id*. at 9.  The Village of Palatine argued that the drainage ditch was open and obvious, and it denied that the ditch was concealed by weeds and other vegetation.  *Id*. at 29.  In support, it pointed to testimony provided by a civil engineer, who opined that the nature of the vegetation surrounding the ditch, as compared to other vegetation in the area, would have alerted a reasonable person as to the presence of the ditch.  However, the plaintiff and three other individuals testified that the ditch was difficult to see due to numerous weeds and other vegetation growing around it.  Because the record contained conflicting testimony as to the visibility of the ditch, the court held that it was proper for the jury to determine the issue.  *Id.* at 29.

¶ 42    In *American National Bank & Trust Co. of Chicago v. National Advertising Co.*, 149 Ill. 2d 14 (1992), a billboard painter was electrocuted when he came into contact with a high-voltage powerline that hung 4½ to 5 feet above the walk rail of the billboard he was painting.  Defendant, who was leasing the billboard, argued that it did not owe the plaintiff a duty of care because the powerline was open and obvious.  *Id*. at 26.  The supreme court rejected this argument.  It noted that, even though a worker provided deposition testimony that he had seen the wire and was aware of the danger it posed (*id*. at 30), other individuals who had also worked on the sign testified that they were unaware of the presence of the powerline (*id*. at 27).  The court concluded that "[s]uch testimony presents a question of fact as to whether or not the danger was open and obvious."  *Id*.

at 27. In other words, the conflicting testimony regarding whether the powerline was an open and obvious danger necessitated that the issue be resolved by the finder of fact rather than determined by the court as a matter of law.

¶ 43    Like the storm water drainage ditch in *McDermott* and the high-voltage powerline in *American National Bank*, here, the exact nature and visibility of the dangerous condition is at issue. Again, no witnesses other than plaintiff and her sister, Cruz, testified as to pothole's visibility. Both agreed that it was difficult to discern. Several photographs of the scene were produced during discovery, including at the relevant depositions, but the only photos that plaintiff arguably testified were true and accurate representations of the condition of the subject hole on the date of her injury (*i.e.* Exhibit Nos. 5 and 6) do not, in our view, readily depict a hole or similar road depression. Again, the other photographs plaintiff was shown during her deposition either did not, according to her testimony, truly capture the scene of her injury, or plaintiff was not asked the question. Put simply, the exhibits and conflicting testimony regarding whether the photographs fairly and accurately depicted the pothole that caused plaintiff to fall reveal a genuine issue of material fact concerning its visibility, especially in light of the uncontested testimony by plaintiff and Cruz that the hole was obscured and shadowed by plaintiff's vehicle and, thus, difficult to perceive. Because there is a factual disagreement about the visibility of the pothole on the day of plaintiff's injury, the determination of that issue should be left to the jury.

¶ 44    In addition to the photographs, we note that the Village interprets other portions of the record far too generously in favor of its position that pothole was open and obvious. For example, it asserts that plaintiff "admitted she was not looking where she was going prior to her fall, but if she had looked[,] she would not have stepped." This assertion mischaracterizes plaintiff's testimony to suggest that she conceded that she was not paying attention as she approached her

vehicle but, if she had paid attention, she agreed that she would have seen the hole and taken care to avoid stepping into it. Neither proposition is supported by plaintiff's testimony. The first proposition, that plaintiff "admitted she was not looking where she was going," appears premised on her testimony that she did not see the hole before she stepped down from the sidewalk and that nothing obstructed her view of the portion of the hole that she stepped into. Plaintiff, however, did not concede that "she was not looking where she was going," but rather, testified that she was looking at the trunk of her vehicle when she stepped from the sidewalk onto the street. The second assertion, that plaintiff admitted that "if she had looked[,] she would not have stepped," is likewise grounded in a misreading of plaintiff's testimony. Plaintiff did not concede, as the Village contends, that she would have observed the pothole simply "if she had looked." Rather, she testified that even if she had looked directly at the street prior to stepping down from the sidewalk, it would have been difficult to appreciate the pothole due to the contour of the street and the shadows cast by her parked vehicle and a nearby tree. In her view, "the street appeared to be even" or "leveled," and it "blended together, so it just looked like a regular street."

¶ 45 The Village also asserts that plaintiff was "aware of the road's recent condition, because her family members had complained about it." Here, the Village suggests that plaintiff had knowledge of the poor condition of the road before her fall and that it was therefore unreasonable for her to step into the street without first scanning it for potential hazards. In making this assertion, the Village omits critical context. Plaintiff acknowledged in her answers to interrogatories that "someone at [her] mother[']s house notified the Village of the condition of the road," but that the Village thereafter "performed some repairs in early 2019." She also acknowledged that "there were depressions previous to [her] accident that had been repaired earlier in the year by the [Village]," and she further stated that she was "unaware of the depression that caused [her] fall

until after [the] accident." Counsel for the Village asked plaintiff about this subject during her deposition. She acknowledged that her sister, Karolina, informed her that someone had called the Village, but that after the call, "[t]here was a patch on the road," meaning the street had undergone some repairs. The Village's selective presentation of the facts implies that plaintiff was injured by a dangerous condition of which she was aware before the injury and that had been reported to the Village but not yet repaired. The Village offers no argument that plaintiff should have anticipated dangerous defects in the roadway despite her belief that the defects she was informed of by her sister had, in fact, been repaired.

¶ 46          E. Whether "the Overall Area" was an Open and Obvious Danger

¶ 47    In addition to the subject pothole itself, the Village argues that the "overall area at issue" should have put plaintiff on notice that she was at risk of falling by stepping onto the roadway. It asserts in its brief that "[t]he entire street area was the open and obvious hazard." The Village directs our attention to an unpublished case,[2] *Conder v. Realington Enterprises, LLC*, 2021 IL App (2d) 200660-U, and argues that courts may consider the overall appearance of a street or roadway, rather than distinguishing between the prominence of a particular defect, when evaluating whether the condition is an open and obvious danger.

¶ 48    In *Conder*, the plaintiff fell and was injured after she stepped into a pothole that was located on a sloped driveway at an apartment complex where she worked. *Id*. ¶¶ 6-9. The hole was approximately 8½ inches wide and 11 inches long, but it was partly filled with crushed asphalt, resulting in a "gap" approximately 6 inches wide, 3 inches long, and 2½ inches deep. *Id*. ¶ 14. At

---

[2] Supreme Court Rule 23 provides that nonpublished orders entered on or after January 1, 2021, "may be cited for persuasive purposes." Ill. S. Ct. R. 23 (eff. Feb. 1, 2023).

the time of her injury, the plaintiff was walking down the "left-center" of the driveway, side-by-side with an associate while they were conversing. *Id*. ¶ 12. The plaintiff looked at her associate as they walked, and the plaintiff stepped into "an apparent hole that was filled in with crushed asphalt" and fell. *Id*. The plaintiff's view of the ground was unobstructed, but she was unsure whether she would have seen the hole even if she had watched her feet while walking because "the crushed asphalt blend[ed] in with the old asphalt." *Id*. ¶¶ 13, 15. The trial court found that the driveway was an open and obvious hazard and entered summary judgment in favor of the defendant. *Id*. ¶ 27.

¶ 49    On appeal, the plaintiff argued that the trial court improperly applied the open and obvious doctrine because it focused on the general condition of the driveway rather than the particular defect that caused her to fall. *Id*. ¶ 33. She also argued that there was a factual issue regarding the condition of the driveway and the particular defect because she disputed that a photograph of the area taken nine months after her injury accurately depicted the pothole, because it looked "wider" in the photo and the driveway had more holes in the photo than on the date of her injury. *Id*. ¶ 40.

¶ 50    We affirmed. *Id*. ¶ 49. At the outset, we stated that the question of whether the photographs accurately depicted the condition of the defect and overall driveway was immaterial given the undisputed testimony that the driveway was "visibly broken" at the time of the plaintiff's injury. *Id*. ¶ 43. We emphasized that three witnesses testified as to the open and obvious deteriorated condition of the driveway, that one of them testified that the driveway had holes, depressions, and divots, and that the plaintiff, herself, agreed that there "were problems on the driveway" and that the entire driveway needed attention. *Id*. We also noted that the plaintiff gave extensive testimony concerning her knowledge of the driveway's poor condition and of efforts to fill the holes with crushed asphalt, and that the plaintiff had traversed the driveway several times prior to her injury.

*Id*. ¶ 49. In reaching our holding, we rejected the plaintiff's attempt to distinguish the subject pothole from the overall condition of the delipidated driveway, because the issue was "not whether a reasonable person would anticipate the danger of stepping on a single hole, but rather whether a reasonable person would anticipate the danger of walking on the visibly broken *** driveway." *Id*.

¶ 51    *Conder* is distinguishable. Significantly, *Conder* hinged on the fact that the testimony regarding the "visibly broken nature of the driveway at the time of the incident" was *undisputed*. *Id*. ¶ 42. We emphasized that, there, the plaintiff: (1) conceded that "there were problems on the driveway" and that the entire driveway needed attention (*id*.); (2) testified at length regarding her knowledge of the deteriorated condition of the driveway and of the use of crushed asphalt to fill the holes; and (3) had traversed the driveway on many occasions (*id*. ¶ 49). In the instant case, plaintiff did not assert in either her answers to the Village's interrogatories or her deposition that the entire road surface was visibly broken or hazardous to walk on. To the contrary, plaintiff consistently testified that she did not make any observations about the condition of the road prior to her fall, including when she pulled up to her mother's house, parked and exited her vehicle, and when she rounded the front of her car to initially approach the home. She also testified that she did not see, prior to her injury, any holes or depressions in the road surface in front of her mother's home, nor did she see any depressions during her prior two most recent visits, which were in July 2019 and "possibly April" of 2019. She acknowledged that, prior to her fall, she was aware that her sister, Karolina, had called the Village to complain about the condition of the road, and that there previously were depressions on the road. However, plaintiff indicated in both her answers to interrogatories and her testimony her belief the depressions or holes were repaired in "early

2019," prior to her fall, and the photographs in the record confirm that the road surface had been repaired or patched at various points.

¶ 52 Even otherwise, the Village fails to establish that the "overall area," namely the street directly in front of the home of plaintiff's mother, was in such disrepair that it was an open and obvious hazard to a reasonable person in plaintiff's position. Specifically, it contends that the "scene photographs clearly establish that the overall area at issue was cracked, gravely [*sic*], and appeared to be a darkened depression that clearly would have been recognizable by a reasonable person traversing upon the street," but it does not specify which photos in the record it relies on.

¶ 53 To the extent that it relies on the same three photos as in its argument that the subject pothole, itself, was an open and obvious hazard, we note, again, that plaintiff denied that Exhibit No. 1 was an accurate portrayal of the scene because the hole was deeper and no vehicles were parked on the street to cast shadows. Moreover, based on our own review of this exhibit, we cannot say that the street appears so treacherous or pothole-ridden that simply stepping onto its surface constitutes a dangerous act as a matter of law. Again, the photo depicts a dark asphalt patch alongside the curb, adjacent to the sidewalk, and which is also surrounded by what appears to be unremarkable, shallow-looking (but numerous) cracks in the asphalt. Other than the particular pothole that caused plaintiff to fall, no other holes or depressions are visible in the photo. Only Exhibit No. 6 shows a visibly "broken" and gravelly area. However, this photo depicts an isolated closeup of the particular defect that caused plaintiff's injury, and it therefore does not bolster the Village's claim that the entire street was an open and obvious hazard. Similarly, the rating by MDS Technologies, Inc. of Four Winds Way as "very poor" does not establish that the "overall area" was hazardous to pedestrians because, according to Gray, the Village's public works and engineering director, the presence of potholes is "essentially irrelevant" to that rating.

¶ 54 In sum, the pleadings, depositions, and photographs of the area in front of the home, including the specific pothole that caused plaintiff to fall, reveal a genuine issue concerning the visibility of the subject pothole, and the Village failed to establish that the condition of the entire road surface was so woeful that it constituted an open and obvious danger. Because of our resolution, it is unnecessary to address plaintiff's arguments regarding the distraction exception to the open and obvious rule.

¶ 55                                     III. CONCLUSION

¶ 56 For the reasons stated, we reverse the judgment of the circuit court of Kane County and remand the cause for further proceedings consistent with this opinion.

¶ 57 Reversed and remanded.